* Almon, Shores, Kennedy, Cook, and Butts, JJ., concurred in denying rehearing; Hooper, C.J., and Maddox, Houston, and See, JJ., dissented.
 On Application for Rehearing
The opinion of March 7, 1997, is withdrawn and the following is substituted therefor.
Roy Isbell and Carroll Isbell petition for a writ of mandamus directing Judge Drayton N. James, of the Jefferson County Circuit Court, to vacate his order compelling them to arbitrate their claims against Southern Energy Homes, Inc. ("Southern"), the manufacturer of a mobile home they purchased from Crest Financial Company, Inc., d/b/a American Housing ("American Housing"). We grant the petition in part and deny it in part.
In December 1993, the Isbells purchased the mobile home that is the subject of this action; they purchased it from American Housing, a mobile home dealership in Moody, Alabama, through the negotiations and actions of Doug Marshman, "secretary-treasurer" of American Housing. In connection with the purchase, the Isbells executed an instrument styled "Manufactured Home Retail Installment Contract and Security Agreement." This instrument was also signed on behalf of American Housing by Marshman. The instrument provided in pertinent part:
 "9. NO WARRANTIES: I [the buyers] agree that there are no warranties of any type covering the Manufactured Home. I am buying the Manufactured Home AS IS and WITH ALL FAULTS and THE ENTIRE RISK AS TO THE QUALITY AND PERFORMANCE OF THE MANUFACTURED HOME IS WITH ME. I agree that any implied warranty of merchantability and any implied warranty of fitness for a particular purpose are specifically excluded and do not cover the Manufactured Home. This No Warranties provision does not apply to the extent that any law prohibits it and it does not cover any separate written warranties. A statement as to model year is for identification purposes only.
". . . .
 "15. MISCELLANEOUS PROVISIONS: This written Contract is the only agreement that covers my purchase of the Property. This Contract can only be modified or amended or provisions in it waived (given up) by a written modification to the Contract signed by you.
 "16. WAIVER OF JURY TRIAL: I hereby waive any right to a trial by jury that I have in any subsequent litigation between me and the Seller, or me and any assignee of the Seller, where such litigation arises out of, is related to, or is in connection with any provision of this Contract whether the Contract is asserted as the basis for a claim, counterclaim, or cross claim, or a defense to a claim, counterclaim, or cross claim.
 "17. ARBITRATION: All disputes, claims, or controversies arising from or relating to this Contract or the relationships which result from this Contract, or the validity of this arbitration clause or the entire Contract, shall be resolved by binding arbitration. . . . Notwithstanding anything hereunto [sic] the contrary, Assignee retains an option to use judicial or nonjudicial relief to enforce a security agreement relating to the Manufactured Home secured in a transaction underlying this arbitration agreement, to enforce the monetary obligation secured by the Manufactured Home or to foreclose on the Manufactured Home. Such relief would take the form of a lawsuit. . . ."
Also among the documents the Isbells received in connection with their purchase was a document drafted by Southern, the manufacturer of the mobile home, entitled "One Year Limited Warranty" (the "Warranty"). The Warranty stated in part: "Southern Energy Homes, Inc., is not liable for any agreementor commitment made by any employee, dealer or agent other thanthose expressly set forth in this warranty." (Emphasis added.)
On December 4, 1995, the Isbells sued Doug Marshman, American Housing, and Southern. Their complaint alleged that the mobile home had been delivered to their property in a damaged and defective condition and that the defendants had failed to effect satisfactory repairs. The defendants jointly moved to stay the action and to compel arbitration based on paragraphs 16 and 17 of the "Manufactured Home Retail Installment Contract and Security Agreement." *Page 574 
On March 8, 1996, the trial court entered the following order: "Southern Energy Homes, Inc.'s Motion To Stay is granted under authority of [Ex parte Gates, 675 So.2d 371 (Ala. 1996)]." On March 22, 1996, the trial court granted the joint motion to compel arbitration; the Isbells filed this mandamus petition. In this Court, the Isbells contend (1) that the arbitration provisions of the "Manufactured Home Retail Installment Contract and Security Agreement" are unconscionable or unenforceable and (2) that neither Marshman nor Southern has standing to enforce the arbitration provisions.
 I. Unconscionability
The sole basis for the Isbells' unconscionability-unenforceability argument is a claim that paragraph 17 lacks mutuality. Specifically, they refer to those provisions denying them the right to seek judicial relief as totheir claims, but allowing the "Assignee" to seek judicial relief as to its claims against them. On the basis of Northcom,Ltd v. James, 694 So.2d 1329 (Ala. 1997), we disagree with this contention.
Northcom involved a covenant not to compete; that covenant contained an arbitration provision. The contract considered in that case "require[d] Creative Broadcasting [Service, Inc. ('Creative Broadcasting')] and its stockholders to submit any disputes they [had] with Northcom [Ltd. ('Northcom')] to arbitration." Id. at 1339. However, it "allow[ed] Northcom in the principal situations in which it might seek relief — a failure by Creative Broadcasting to convey as agreed or a breach by its stockholders of the covenant not to compete — to bring an action for equitable relief or damages." Id. at 1339. We noted that there had been "no indication that [the] contract [was] a contract of adhesion," id. at 1339, and held that, in the absence of such an indication, the contract was not unconscionable or unenforceable merely because one party was required to arbitrate its claims while the other party was entitled to judicial relief for its claims. Id. at 1339.
No contention has been made in this case that the contract is a contract of adhesion. On the authority of Northcom, therefore, we hold that the arbitration provision is not unconscionable or unenforceable merely because it requires the Isbells to arbitrate but provides the "Assignee" with a judicial forum.
 II. Nonsignatory Standing
The Isbells contend that neither Marshman nor Southern was a signatory to the "Manufactured Home Retail Installment Contract and Security Agreement." Consequently, they argue, neither Marshman nor Southern has standing, pursuant to that instrument, to compel the Isbells to arbitrate their claims against them.
 A. Marshman
The disposition of this question as to Marshman is controlled by Ex parte Gray, 686 So.2d 250 (Ala. 1996). That case involved an action against Crown Pontiac, Inc. ("Crown"), and "Crown's salesman, Shannon Pardue." Id. at 251. The plaintiff alleged "that Pardue, as Crown's agent, while acting within the line and scope of his agency, falsely represented the condition of the vehicle Gray was buying." Id. In refusing to direct the trial court to vacate its order staying Gray's action pending arbitration, this Court stated: "A party should not be able to avoid an arbitration agreement merely by suing an employee of a principal." Id.
In this case, Marshman stands on even better ground that did Pardue in Gray. This is so because Marshman, in fact, signed the "Manufactured Home Retail Installment Contract and Security Agreement" on behalf of American Housing. In that sense, he is
a signatory. The petition is, therefore, denied to the extent it seeks to deny Marshman the benefit of the arbitration provisions.
 B. Southern
The standing of Southern, however, to enforce the arbitration provisions is quite another matter. In granting Southern's motion to compel arbitration, the trial court expressly relied on Ex parte Gates, 675 So.2d 371 (Ala. 1996). But that case is inapposite. There, Palm Harbor Homes, Inc. ("Palm Harbor"), a mobile home manufacturer, id. at 373, successfully sought, pursuant to a contract *Page 575 
to which it was not a signatory, to compel the arbitration of claims against it in an action commenced by the purchasers of a mobile home it had manufactured. Ex parte Jones,686 So.2d 1166, 1170 (Ala. 1996) (Maddox, J., dissenting). After the trial court ordered the arbitration of all claims involved in the action, the buyers sought a writ of mandamus directing the trial judge to vacate the order. Gates, 675 So.2d at 372-73.
In denying the buyers' petition, this Court did notaddress, discuss, or even mention the fact that Palm Harbor was not a signatory. This was because the buyers failed to present that argument to the trial court. Thus, this Court in Gates
merely applied the well-established rule that it "will not reverse a trial court's judgment on a ground raised for the first time on appeal." Kitchens v. Maye, 623 So.2d 1082, 1088
(Ala. 1993).
The fact that Palm Harbor was not a signatory to the contract was a nonissue in Gates. As a result, that case simply cannot be cited as support for the proposition that the manufacturer of a mobile home has standing to enforce an arbitration provision in a contract executed by the retailer and the buyers of the mobile home.[1] To be sure, Gates did not hold that a nonsignatory manufacturer did not have standing to enforce an arbitration provision in a contract between the retail seller and the buyer. But to rely on that case for the opposite proposition is to rely on it not for what it held but for what it did not hold. In short, Gates is inapposite.
Southern also contends that the Isbells' claims against it are subject to "arbitration by equitable estoppel," on the theory that their claims "are founded on and intertwined with a contract containing an arbitration clause." Answer ofRespondents, Southern Energy Homes, Inc., and Honorable DraytonN. James, at 7. For this proposition, they cite Sunkist SoftDrinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753, 757 (11th Cir. 1993), cert. denied, 513 U.S. 869, 115 S.Ct. 190,130 L.Ed.2d 123 (1994); and McBro Planning Development Co. v.Triangle Electrical Construction Co., 741 F.2d 342 (11th Cir. 1984). However, a cursory analysis of these two cases reveals that each of the two represents a discrete class of cases involving nonsignatories — neither of which class includes this case — and will not support the broad proposition for which it is cited.
In McBro, for example, Triangle Electrical Construction Company, Inc. ("Triangle"), and McBro Planning and Development Company ("McBro") both contracted with St. Margaret's Hospital to perform services in connection with certain "additions to and renovations of the hospital." 741 F.2d 342. McBro's contract required it to serve as "construction manager" of the renovation project, and Triangle's contract required it to provide "electrical work." Id. at 342-43. McBro and Triangle each had executed a written contract with St. Margaret's Hospital, and each contract contained an arbitration provision. However, they had executed no mutual contract. Id. at 343.
Triangle sued McBro in a complaint containing claims "under a third-party beneficiary (contract) count and intentional interference with contract and negligence (tort) counts."Id. Triangle alleged that McBro had "harassed and hampered its work" under Triangle's contract with St. Margaret's Hospital.Id. McBro sought to compel arbitration of the dispute on the basis of Triangle's contract with the hospital. It contended, among other things, that by suing under a third-party beneficiary theory, Triangle had "strongly impl[ied] if not conced[ed] privity of contract with McBro." Id. The United States District Court for the Northern District of Alabama ordered the parties to arbitrate; Triangle appealed. Id. at 342.
The Court of Appeals for the Eleventh Circuit affirmed the arbitration order. Id. It did so on the basis of the "close relationship of the three entities [there] involved — St. Margaret's, Triangle, and McBro — and the close relationship of the alleged wrongs to McBro's contractual duties to perform as construction manager." Id. at 343. The court noted that at least two counts of the complaint directly involved "Triangle's rights *Page 576 
under its contract with St. Margaret's" — Count IV, alleging "interference" with those rights, and Count V, alleging "negligence '[d]uring the course of construction.' " Id. at 343 n. 4. The court also pointed out that the Triangle-St. Margaret's Hospital contract was "replete with references to McBro's duties as construction manager, on behalf of St. Margaret's, as regards supervision of the project, for which Triangle was a contractor." Id. at 344. Citing Hughes MasonryCo. v. Greater Clark County School Bldg. Corp., 659 F.2d 836
(7th Cir. 1981), a case arising out of functionally equivalent facts, it reasoned that Triangle "was equitably estopped" from disclaiming the applicability to McBro of its own contract with St. Margaret's, when the essence of Triangle's claims against McBro was that McBro had "breached the duties and responsibilities assigned it" by that contract. 741 F.2d at 344.
A second class of cases favoring nonsignatories is represented by Sunkist Soft Drinks, Inc. v. Sunkist Growers,Inc., 10 F.3d 753 (11th Cir. 1993). The dispute in Sunkist
arose out of a "license agreement" between Sunkist Growers, Inc. ("Sunkist"), and Sunkist Soft Drinks ("SSD"), which, at the time of the making of the agreement, was a subsidiary of General Cinema Corporation. Id. at 755. Under that agreement, SSD could market soft drinks under the " 'Sunkist' brand name."Id. The license agreement also contained a clause providing in pertinent part: "Except for any claim with respect to the ownership rights in Licensed Trademarks, any controversy or claim arising out of or relating to this Agreement or the breach thereof, including those regarding termination or failure to renew this Agreement, shall be settled by arbitration. . . ." Id. (emphasis omitted).
Subsequently, SSD was purchased by, and essentially merged with, the Del Monte Corporation. Id. More specifically, "Del Monte absorbed SSD into its own beverage products division, known as Del Monte Franchised Beverage Products. By placing the 'Sunkist' brand under a single administration with its own soft drink brands, Del Monte effectively stripped SSD of its employees and management and any other separate operating status." Id.
Eventually, a dispute arose over "SSD's performance under the license agreement," and Del Monte sought a judgment declaring that the dispute was subject to arbitration. Id. Sunkist, a signatory of the license agreement, counterclaimed against Del Monte, a nonsignatory, and its subsidiary, SSD, the other signatory. Id. Sunkist alleged that Del Monte had, "through its management and operation of SSD, caused SSD to violate various terms and provisions of the license agreement." Id. at 758. Del Monte sought to "compel arbitration on the grounds that Sunkist was contractually obligated to arbitrate its claims under the terms of the license agreement." Id. at 755-56. In the Court of Appeals for the Eleventh Circuit, the issue was "whether Sunkist [was] equitably estopped from contesting Del Monte's standing to invoke the [arbitration] clause." Id. at 757.
The court answered that question in the affirmative.Id. at 758. Without setting forth in detail the factual allegations on which Sunkist's counterclaims against the nonsignatory were based, the court explained that "[e]ach [counter]claim asserted by Sunkist [made] reference to the license agreement" and that "each [counter]claim presume[d] the existence of such an agreement." Id. The court also deemed significant the fact that SSD had, "[f]or all practical purposes, . . . lost its independent operating status and [become] a part of Del Monte." Id. Thus, after considering the "nexus between Sunkist's claims and the license agreement, as well as the integral relationship between SSD and Del Monte," the court concluded "that Sunkist [was] equitably estopped from avoiding arbitration of its claims." Id.
The factual dissimilarities between the Isbell's case and the two classes of cases represented by Sunkist and McBro, supra, are obvious and dispositive. The inapplicability of these cases is best demonstrated by a comparison with the following case, which does involves facts and issues functionally indistinguishable from those presented here.
In Wilson v. Waverlee Homes, Inc., 954 F. Supp. 1530
(M.D.Ala. 1997), the United *Page 577 
States District Court for the Middle District of Alabama held that the manufacturer of a mobile home had no standing or estoppel grounds on which to enforce an arbitration provision contained in a contract, to which it was not a signatory, between the retail seller and the buyer. Id. at 1537. The dispute in Wilson began when Richard Wilson and Mary Wilson and Douglas Woodall and Elizabeth Woodall purchased two mobile homes from Hart's Mobile Home Sales, Inc. ("Hart's"). Id. at 1532. The mobile homes had been manufactured by Waverlee Homes, Inc. ("Waverlee"). Id. In conjunction with the Wilsons' purchase, they and Hart's executed an "installment sales and financing contract," which stated in part:
 "Any controversy or claim between or among you and I or our assignees arising out of or relating to this contract or any agreements or instruments relating to or delivered in connection with this contract, including any claim based on or arising from an alleged tort, shall, if requested by either you or me, be determined by arbitration, reference, or trial by a judge as provided below. . . . The award of the arbitrator(s) shall be in writing and include a statement of reasons for the award. The award shall be final. Judgment on the award may be entered in any court having jurisdiction, and no challenge to entry of judgment upon the award shall be entertained. . . ."
954 F. Supp. at 1532-33 n. 1 (emphasis added). In conjunction with the Woodalls' purchase, they and Hart's executed a "similar contract," which stated in part:
 "All disputes, claims or controversies arising from or relating to this Contract or the parties thereto shall be resolved by binding arbitration by one arbitrator selected by you with my consent. Judgment upon the award rendered may be entered in any court having jurisdiction. . . . The parties agree and understand that all disputes arising under case law, statutory law and all other laws including, but not limited to, all contract, tort and property disputes will be subject to binding arbitration in accord with this Contract."
Id. (Emphasis added.) Waverlee was not a signatory to, and was not mentioned in, any Hart's/Wilson or Hart's/Woodall contract that contained an arbitration provision. Id. at 1532-33. Waverlee did, however, expressly warrant that the mobile "homes would be free of substantial defects in materials and workmanship for a period of one year and that Waverlee would repair or replace any such defects occurring during that period." Id. at 1532.
The Wilsons and the Woodalls sued Waverlee under various breach-of-warranty theories, alleging that their homes contained "substantial manufacturing defects" and that those defects had "gone uncured or [had] been improperly repaired."Id. Waverlee moved to compel arbitration of the claims against it on the basis of the arbitration clauses in the Hart's/Wilson and Hart's/Woodall contracts. Id. The trial court framed the issue as "whether a warrantor who is a nonsignatory to a commercial installment sales and financing contract containing an arbitration clause may use contract principles, such as equitable estoppel, to apply the [Federal Arbitration Act, 9 U.S.C. § 1-16] and so compel buyers complaining of breach of warranty to arbitrate their claims." Id. at 1533. The court held that it could not. Id. at 1540.
Before reaching that conclusion, the court noted with approval the general principle that "one 'who is not a party to a contract has no standing to compel arbitration.' "Id. at 1534 (quoting Britton v. Co-op. Banking Group,4 F.3d 742, 744 (9th Cir. 1993)). The court then thoroughly analyzed and distinguished the class of cases represented by McBro,supra, from the case before it, stating:
 "The doctrine of equitable estoppel simply does not apply on the facts presented by the instant cases. Admittedly, as McBro demonstrates, equitable estoppel may apply where a party seeks, in some way, to benefit from an agreement without being in turn bound by it. Therefore, if the plaintiffs were alleging that the installment sales and financing contracts they had with Hart's Mobile Home imposed certain duties of performance upon Waverlee, they could not both assert the right *Page 578 to receive such performance from Waverlee under the contracts, and, at the same time, deny application of the arbitration clause governing disputes under those contracts. However, the plaintiffs brought their claims under a separate and distinct warranty agreement that contains no arbitration clause, and are thus not estopped from resisting Waverlee's efforts to compel them to submit their claims to arbitration. See Hartford Accident Indem. Co. v. Scarlett Harbor Associates Ltd. Partnership, 109 Md. App. 217, 674 A.2d 106, 143, cert. granted, 343 Md. 334, 681 A.2d 70 (1996).
 "It is not enough that the defendant and the third party have common and parallel duties toward the plaintiff, and so could both be sued on the same theory of tort. Thus, it is not determinative that the plaintiffs here could have chosen to sue Hart's Mobile Home on some of the liability theories raised in their complaints, but did not. What matters is that none of the duties the plaintiffs are claiming that Waverlee breached arose under and were assigned to it by the sales agreements between the plaintiffs and Hart's Mobile Home, which are the sole agreements governed by an arbitration clause here. The warranty claims here are not intertwined with and founded upon the sales installment agreements, except in the utterly collateral sense that if the plaintiffs had never purchased their mobile homes, they would not have been protected by the warranties that came with them.
". . . .
 "In summary, Waverlee, in its various legal briefs and responses to the plaintiffs' arguments, aside from McBro and a few factually similar equitable estoppel cases that don't apply here, has failed to cite a single authority challenging the assertion that 'An entity that is neither a party to nor agent for nor beneficiary of the contract lacks standing to compel arbitration.' Britton, 4 F.3d at 744. Because none of the exceptions discussed above applies, the court must conclude that Waverlee is not entitled to compel the plaintiffs to arbitrate their claims."
954 F. Supp. at 1536-37 (emphasis added).
Wilson is directly on point with this case and demonstrates the inapplicability of Sunkist and McBro, supra, the federal cases cited by Southern. Those cases involved plaintiff-signatories, whose claims against defendant-nonsignatories actually turned on duties set forth in the contracts requiring arbitration.
By contrast, the Isbells' cause of action against Southern arose out of warranties Southern itself promulgated, most particularly from warranties set forth in the Southern-generated Warranty, and other Southern-generated agreements, all having nothing to do with the "Manufactured Home Retail Installment Contract and Security Agreement." The Isbells' complaint contained the following nine counts against Southern: (I) breach of warranty to repair defects; (II) breach of implied warranty of habitability; (III) breach of contract; (IV) "Negligent or Wanton Construction, Inspection and/or Repair"; (V) misrepresentation; (VI) "Deceit"; (VII) fraudulent suppression; (VIII) breach of Ala. Code 1975, § 7-2-314 (implied warranty of merchantability); and (IX) breach of Ala. Code 1975, § 7-2-315 (implied warranty of "fitness for particular purpose"). The factual allegations underlying those counts were (1) that the mobile home was a "special-order" unit that "was to be delivered directly from the factory" to the Isbells' property; (2) that the unit arrived at the Isbells' property in a defective and damaged condition; (3) that Southern misrepresented or suppressed material facts regarding the condition of the mobile home; (4) that the damage and defects were "directly attributable to the manufacturer's failure to properly construct, inspect, and transport" the mobile home; and (5) that Southern had failed to "correct" the problems with the unit as required by Southern's express and implied warranties, including those specifically set forth in the Warranty.
The breach of contract claim was based on allegations that the Isbells and Southern had agreed that Southern was to "construct and transport" the mobile home to the *Page 579 
Isbells' property. No physical evidence of that agreement has been presented to this Court. Certainly, it does not exist in the form of the "Manufactured Home Retail Installment Contract and Security Agreement," which, in fact, never mentions the manufacturer.
Indeed, the "Manufactured Home Retail Installment Contract and Security Agreement" on which Southern now attempts to rely is an unremarkable, two-page document concerned entirely with the duties and responsibilities of (1) the Isbells, (2) American Housing, and (3) Green Tree Financial Corporation ("Green Tree"), which financed the installment sale. For example, it sets forth (1) the amount financed, (2) the finance charge, (3) the annual percentage rate, (4) the total amount of payments, and (5) the total sale price; and it provides for the purchase of "optional credit life and disability insurance" and also specifically provides for assignment of the contract to Green Tree. Significantly, paragraph 9 expressly disclaims allwarranties, stating:
 "I agree that there are no warranties of any type covering the Manufactured Home. I am buying the Manufactured Home AS IS and WITH ALL FAULTS and THE ENTIRE RISK AS TO THE QUALITY AND PERFORMANCE OF THE MANUFACTURED HOME IS WITH ME. I agree that any implied warranty of merchantability and any implied warranty of fitness for a particular purpose . . . do not cover the Manufactured Home. . . ."
Furthermore, paragraph 15 contained an "integration" clause, which provided: "This written Contract is the only agreementthat covers my purchase of the Property. This Contract can only be modified or amended or provisions in it waived (given up) by a written modification to the Contract signed by you." (Emphasis added.) Thus, not only does the "Manufactured Home Retail Installment Contract and Security Agreement" omit all reference to the manufacturer, but it expressly disclaims allthe bases for the Isbells' claims against Southern.
Moreover, there are no allegations against Green Tree, the assignee. There are no allegations involving the terms or conditions of payment or the optional credit life and disability insurance. In short, the claims against Southern have nothing to do with the terms and conditions of the "Manufactured Home Retail Installment Contract and Security Agreement." Conceivably, the Isbells' action against Southern could be prosecuted to a conclusion without that contract evenbeing offered into evidence.
This case is, therefore, of a different species thanSunkist and McBro, supra, in which the claims of the plaintiff-signatories against defendant-nonsignatories actually turned on the terms of the contract containing the arbitration clause. Also, in Sunkist, the defendant-nonsignatory was aparent corporation seeking to invoke a contract to which its subsidiary was bound.
"[P]arties are not bound by an arbitration clause merely because it exists." Otto Wolff Handelsgesellschaft v. SheridanTransp. Co., 800 F. Supp. 1353, 1358 (E.D.Va. 1992) (emphasis added). Any case coming before this Court that involves the right of nonsignatories to compel arbitration will, therefore, be peculiarly fact-specific and will require a penetrating analysis of the facts and an application of traditional contract principles. A party, in order to demonstrate its right to rely on provisions of a contract to which it was not a signatory, must show that the factual scenario falls within a recognized class of cases, such as the class represented bySunkist or McBro. This is not such a case.
Instead, this case is substantially identical toWilson, in that "[t]he warranty claims here are not intertwined with and founded upon the sales installment agreement, except in the utterly collateral sense that if the plaintiffs hadnever purchased their mobile homes, they would not have beenprotected by the warranties that came with them."954 F. Supp. at 1536 (emphasis added).
Before concluding our discussion of Wilson, we note in passing an alternative holding of first impression in that case, namely, that enforcement of the binding arbitration clauses by Waverlee, the nonsignatory manufacturer of the mobile homes purchased by *Page 580 
the plaintiffs, would violate the Magnuson-Moss Warranty — Federal Trade Commission Improvement Act, 15 U.S.C. § 2301-12 (the "Magnuson-Moss Act"). Wilson,954 F. Supp. at 1539-40.
Not only did the plaintiffs in Wilson challenge, on generalcontract principles, the standing of Waverlee to enforce the arbitration clauses in their contracts with Hart's,954 F. Supp. at 1533-37, but they also contended, on the basis of the Magnuson-Moss Act, that "because the installment sales and financing contracts between them and Hart's Mobile Home provide for final or binding arbitration, they could not be compelled to arbitrate their claims against Waverlee."954 F. Supp. at 1537 (emphasis in original). The court agreed with those contentions, explaining:
 "The plaintiffs correctly observe that the language of the Magnuson-Moss Act, the regulations adopted pursuant to it, and its legislative history all confirm that Congress and the Federal Trade Commission intended that, with the exception of an informal and non-binding dispute resolution mechanism regulated and defined under the Act, consumers are to retain full and unfettered access to the courts for the resolution of their disputes.
 ". . . The Magnuson-Moss Act indicates that Congress intended to preserve a judicial forum for consumers. The Act provides that 'a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with an obligation under this title or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief.' 15 U.S.C.A. § 2310(d). The Act recognizes only one exception to this entitlement. The Act provides for the establishment of 'informal dispute settlement mechanisms,' § 2310(a)(1), or 'informal dispute settlement procedures.' § 2310(a)(3)."
954 F. Supp. at 1537 (emphasis added). After an exhaustive analysis of legislative and regulatory history, the court stated:
 "These comments make clear that binding arbitration, of the kind contained in the contracts between the plaintiffs and Hart's Mobile Home, is not permissible under the regulations promulgated by the Federal Trade Commission.
". . . .
 ". . . If Waverlee had third-party standing, or estoppel grounds, for compelling arbitration with a dissatisfied consumer, then every manufacturer, obligated by state and federal law to provide certain warranties for the protection of consumers, merely by introducing its products into the stream of commerce, and colluding with product retailers to insert broad and all-inclusive arbitration clauses in consumer contracts, would always be able to avoid the strictures and edicts of the Magnuson-Moss Act. The court refuses to extend the law of third-party beneficiary contract rights, or of equitable estoppel, to reach so profoundly inequitable a result under the Act."
954 F. Supp. at 1539-40 (emphasis added).
Wilson's holding and rationale as to the Magnuson-Moss Act appear applicable to the facts of this case. Like the contracts in Wilson, the "Manufactured Home Retail Installment Contract and Security Agreement" provides for "binding arbitration." That issue is not before us at this time, however. Therefore, the applicability vel non of the Magnuson-Moss Act to the arbitration provisions in this case forms no part of our holding.
We do hold, however, that Southern is not entitled to rely on a theory of estoppel to compel the Isbells to arbitrate their claims against it. Indeed, to the extent that estoppel has any application in this case, and we hold that it has, it estopsSouthern, as it did in Ex parte Martin, 703 So.2d 883 (Ala. 1996). Martin, like this case, involved an action against, among others, Southern by the buyers of a mobile home manufactured by Southern. 703 So.2d at 884. The claims of Barbara Martin and George Martin against Southern were based on allegations that Southern had breached certain warranties on the home. 703 So.2d at 885. As in this case, Southern had issued to the buyers the Warranty, stating: "Southern Energy Homes, Inc., is not liable for any agreement or commitment madeby any employee, dealer or agent other *Page 581 than those expressly set forth in this warranty." Ex parteMartin, 703 So.2d at 885 (emphasis in Martin).
At the outset of that action, namely, in its answer to the complaint, Southern asserted "that it was not 'in privity with' the contract under which the Martins purchased the mobile home." 703 So.2d at 884. Subsequently, both Southern and the seller of the mobile home moved to compel arbitration on the basis of a clause contained in that purchase contract. Thus, Southern's motion to compel arbitration was based on the contract it had previously disclaimed. Id.
This Court declared: "[T]he Martins' claims against Southern Energy Homes arise from the limited warranty that it issued on the mobile home, by which, on its face, Southern Energy Homes disclaimed any liability under the purchase agreement; it cannot now seek protection under that agreement." 703 So.2d at 887. In other words, we held, under facts identical to those presented here, that Southern was estopped to rely on the contract it had disclaimed in its own warranty.
The Warranty given the Isbells contains the same disclaimer we addressed in Martin. The disclaimer is very broad and does not, by its terms, limit its application to warranties. It is clearly broad enough to encompass the retail agreement on which Southern now seeks to rely in order to compel arbitration. Thus, we hold that Southern is estopped to rely on the "Manufactured Home Retail Installment Contract and Security Agreement," which it has disclaimed under its own Warranty.
Finally, and most fundamentally, we hold that the arbitration provisions in this case are not broad enough to include the claims against Southern. In so holding, we considerboth paragraph 16 and paragraph 17 of the "Manufactured Home Retail Installment Contract and Security Agreement." To be sure, paragraph 17 does state that "[a]ll disputes, claims, or controversies arising from or relating to this Contract or the relationships which result from this Contract, or the validity of this arbitration clause or the entire Contract, shall be resolved by binding arbitration." However, that provision must be read in pari materia with paragraph 16, which specifically designates those parties to whom the waiver/arbitration provisions actually were intended to apply. Paragraph 16 limitsthe application of the arbitration clause to (1) "I [the Isbells]," (2) "the Seller [American Housing]," and (3) "any assignee of the Seller [Green Tree]." Significantly, those are the same — and the only — parties ever listed in that contract.
In fact, when all the relevant "arbitration" provisions in this contract are considered, one must conclude that the scope of the requirement is not functionally different from the one we considered in Martin. In Martin, before holding that Southern was estopped to rely on the contract containing the arbitration provision, we also held that the language of the arbitration provision was not broad enough to include the Martins' claims against Southern. 703 So.2d at 886. Specifically, we explained:
 "[T]he arbitration agreement names only two parties and is signed only by the Martins, an agent for [the seller], and two witnesses. Further, in setting out the methods by which arbitration will be carried out, the agreement repeatedly refers to the 'two parties' and 'both parties,' further evidencing the fact that the agreement was only between [the seller] and the Martins, without reference or application to another party."
Id. at 885.
The Isbells are entitled to a writ of mandamus to the extent that they can demonstrate "(1) a clear legal right . . . to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) a lack of another adequate remedy; and (4) properly invoked jurisdiction of the court." Ex parte Martin, 598 So.2d 1381, 1383 (Ala. 1992). Pursuant to this standard, they are entitled to a writ directing the trial judge to vacate his order, but only insofar as that order compelled them to arbitrate their claims against Southern. To that extent, the writ shall issue. To the extent they seek to vacate the order as to the parties on the ground of lack of mutuality, and as to Doug Marshman, in particular, on *Page 582 
the ground of his employee status, it is denied.
APPLICATION GRANTED; OPINION OF MARCH 7, 1997, WITHDRAWN; OPINION SUBSTITUTED; PETITION GRANTED IN PART AND DENIED IN PART.
ALMON, SHORES, KENNEDY, and BUTTS, JJ., concur.
HOOPER, C.J., and MADDOX, HOUSTON, and SEE, JJ., dissent.
[1] Gates also involved no issue regarding unconscionability. Consequently, no unconscionability argument can be made from a comparison of the contract provisions set forth in the Gates
opinion with those involved here.