In re Roy A. and Cindy
L. KNEPP, Debtor.

Roy A. Knepp, Plaintiff,

v.

Credit Acceptance Corporation, Wynn's Oil Company, and MeritPlan Insurance Company, Defendants.

Bankruptcy No. 98–40276.
Adversary No. 98–40481.

United States Bankruptcy Court,
N.D. Alabama,
Eastern Division.

Jan. 29, 1999.

Earl A. Underwood, Jr., Huntsville, AL, for Debtor.

W. Percy Badham, III, Brannon Buck, Maynard, Cooper & Gale, P.A., Birmingham, AL, for Wynn Oil Company.

Michael Brock, Rushton, Stakely, Johnston, & Garrett, P.A., Huntsville, AL, for MeritPlan Insurance Company.

Wynn M. Shuford, William H. King, III, Lightfoot, Franklin & White, L.L.C., Birmingham, AL, for Credit Acceptance Corporation.

## MEMORANDUM OPINION

JAMES S. SLEDGE, Bankruptcy Judge.

This matter is before the Court on the Defendants' Motions to Stay Proceedings and Compel Arbitration. The Plaintiff filed this adversary proceeding requesting this Court determine the validity and extent of a lien and raised allegations that as part of the sale of an automobile, the Defendants engaged in various fraudulent actions, violated the Alabama Mini–Code, and engaged in civil conspiracy. Further, the Plaintiff sought to have this action certified as a class action under Fed.R.Civ.P. 23. In response, the Defendants filed Motions to Compel Arbitration seeking enforcement of an arbitration clause contained in the Buyer's Order signed by the Plaintiff when he purchased the vehicle.

## I. INTRODUCTION:

Motions to compel arbitration present courts with one of the most difficult issues facing the judiciary today. Should a court enforce an arbitration agreement included as part of a typical, standard, pre-printed consumer transaction against the consumer? Ask any reasonable man on the street, i.e. a consumer, if he thinks it is fair that he is barred from access to the courts when he has a claim based on a form contract which contains an arbitration clause and he will respond with a resounding "No!" Our system of justice leaves many issues that arise within the context of a judicial proceeding to the discretion of the trial judge. Ofttimes, this discretion is referred to as the "smell test." The reality that the average consumer frequently loses his/her constitutional rights and right of access to the court when he/she buys a car, household appliance, insurance policy, receives medical attention or gets a job rises as a putrid odor which is overwhelming to the body politic.

When it comes to arbitration, we appear to have lost our sense of history. The lords of England converged upon Runnymeade centuries ago to demand the Magna Charta of King John. The power of the sovereign was divided. Thereafter, the Western legal system, evolved to cherish and delicately depend upon divided authority with an independent judiciary available to resolve the claims of the weakest members of our society. The decade of the Sixties bears ample witness to us that the availability of courts to the weak can help prevent violent upheaval and provide a peaceful avenue of social change. The Supreme Court has frequently opined that every attempt of the powerful to attempt to block access to the courts to the weak must be carefully scrutinized. Mr. Justice Hugo L. Black admonished, "Under our constitutional system, courts stand against any winds that blow as havens of refuge for those who might otherwise suffer because they are helpless, weak, outnumbered, or because they are non-conforming victims of prejudice and public excitement." *Chambers v. State of Florida,* 309 U.S. 227, 241, 60 S.Ct. 472, 479, 84 L.Ed. 716 (1940). This challenge must be confronted daily in this district by its prominent display in the lobby of the Hugo L. Black United States Courthouse in Birmingham, Alabama. Trial by jury is another expression of divided authority. Mr. Justice Story eloquently stated, "[T]he trial by jury is justly dear to the American people. It has always been an object of deep interest and solicitude, and every encroachment upon it has been watched with great jealousy." *Parsons v. Bedford,* 3 Pet. 433, 446, 7 L.Ed. 732 (1830). Again, the Supreme Court stated, "[T]he right of jury trial in civil cases at common law is a basic and fundamental feature of our system of federal jurisprudence ... [a] right so fundamental and sacred to the citizen [that it] should be jealously guarded by the courts." *Jacob v. New York City,*

315 U.S. 752, 752–753, 62 S.Ct. 854, 86 L.Ed. 1166 (1942).

In 1925, the Congress of the United States passed the Federal Arbitration Act ("FAA"). The purpose of the Act was to permit merchants to negotiate a method to resolve disputes in a non-judicial forum. When two equally sophisticated parties bargain at arms length to submit disputes to arbitration, that agreement should be enforceable. Troubling questions arise when one party lacks the sophistication and bargaining power of the other. For example, how does a policy strongly favoring arbitration affect a consumer contract when the arbitration agreement is buried in the fine print of a lengthy, detailed contract? How does this federal policy apply to a consumer transaction when all contracts in the market include an arbitration agreement and the consumer can only choose to enter the transaction with the arbitration agreement or forego the product or service altogether? How does this policy apply to the employee working under a manual requiring binding arbitration? The answer is clear. The consumer has little choice: give up constitutional rights long held precious to Western legal systems or give up access to the marketplace. When introduced as a method to control soil erosion, kudzu was hailed as an asset to agriculture, but it has become a creeping monster. Arbitration was innocuous when limited to negotiated commercial contracts, but it developed sinister characteristics when it became ubiquitous.

The use of arbitration clauses in form contracts is undergoing an explosive expansion. Our legal system allows the weakest members of our society a means to file a complaint in a simple fashion and enter the most formal halls of justice for consideration and an opportunity to be heard. Arbitration, however, requires an initial payment of a minimum of $500.00 to more than $7,000.00 and daily costs of hundreds of dollars with no guaranteed due process, no right to a trial by jury, no right to an independent impartial judge, no right to discovery, etc. While due process does not attach to private transactions, due process rights may be available to the consumer *if* the court applies a preference for arbitration over litigation rather than a neutral interpretation of a contract. Such preference constitutes state action, especially when state law rejects enforcement of arbitration.

In the final analysis, arbitration amounts to the privatization of our judicial system. The Supreme Court has repeatedly ruled that Congress is limited in its power to block access of parties to a trial by jury. *See, e.g., Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 51–52, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989). Was it the intention of Congress that consumer transactions be governed by binding arbitration? Does the United States Constitution permit such results?

The Supreme Court of Alabama has struggled with these fundamental concepts. Last year the courts of Alabama issued over sixty (60) opinions concerning arbitration. In *Allstar Homes, Inc. v. Waters*, 711 So.2d 924 (Ala.1997), Justice Butts stated,

"[A]ny arbitration agreement is a waiver of a party's right under Amendment VII of the United States Constitution to a trial by jury and, regardless of the federal courts' policy favoring arbitration, [there is] nothing in the FAA [the Federal Arbitration Act, 9 U.S.C. §§ 1–16] that would permit such a waiver unless it is made knowingly, willingly, and voluntarily."

*Id.* at 929. Justice Cook observed:

These comments by the proponents, drafters, and sponsors of the bills that culminated in the FAA, in addition to the revision that excluded employment contracts, illustrate the importance ascribed to the voluntariness of the contracting parties. Indeed, volition is the sine qua non of the FAA's constitutionality, for specific enforcement of an arbitration provision to which a party has not voluntarily agreed would clearly violate the Seventh Amendment.

Indeed, specific enforcement of arbitration contracts for the purchase of consumer goods or services is beset by a number of problems implicating the Seventh Amendment. The reality is that contracts containing these provisions appear with increasing frequency in today's marketplace. As a result, consumers find it increasingly

difficult to acquire basic goods and services without forfeiting their rights to try before a jury the common-law claims that may accrue to them. Entire segments of the market for certain goods and services, such as automobile sales and their attendant necessary financing, are being closed to consumers who are unwilling to forfeit the rights guaranteed them by the federal and state constitutions. To sanction this market closure would essentially effect the repeal of the Seventh Amendment by the concurrence of judicial with legislative fiat.

Moreover, the coerced waiver of the right to a trial by jury results in a monetary penalty to the consumer. This is so because it deprives the consumer purchaser or debtor of the benefit of his bargain, along with the time he spent and the expense he incurred in negotiating it. More specifically, many consumer credit transactions containing "agreements" to arbitrate actually involve two independent "agreements." The credit sale of a new automobile, for example, is, according to ordinary experience, often consummated between the consumer-buyer and an agent of the automobile dealer only after hours, or, in some cases, days, of bargaining and negotiation. Although a number of terms important to both parties may be involved in these negotiations, one term that seldom, if ever, arises during the bargaining process is arbitration. Indeed, it may safely be said that the thought of specific constitutional provisions never impresses itself upon the mind of the consumer-buyer, and, seldom, if ever, upon the mind of the dealer's agent, before an agreement has been reached on the lot or the showroom floor encompassing all the essential terms of the sale.

After the consummation of such a "showroom" agreement, the buyer is, for the first time, then presented with "take-it-or-leave-it" written documents. These documents do not merely memorialize the terms of the prior agreement, but contain a pivotal term, one that was not negotiated and that is, as in this case, non-negotiable. At that stage, the buyer typically learns, for the first time, that in order to receive the benefit of the bargain he has already

consummated, and to avoid incurring a monetary penalty consisting of the time he spent and the expense he incurred in negotiating that bargain he must then agree to waive his right to a trial by jury.

This second "agreement" constitutes a modification of the first and is a new contract, *see Little v. Redditt*, 264 Ala. 371, 88 So.2d 354 (1956), subject to the rules regarding consideration and mutual assent set forth in *Winegardner v. Burns*, 361 So.2d 1054, 1057–58 (Ala.1978) (*quoting with approval Moore v. Williamson*, 213 Ala. 274, 104 So. 645 (1925)). The consumer must either sign the contract, and, thereby, waive his Seventh Amendment guarantee, or begin the process anew elsewhere. Because of the penalty that results from such a waiver, the specific enforcement of an adhesion contract containing an arbitration provision places the Seventh Amendment on a different footing than U.S. Const. amend. IV (guaranteeing freedom from "unreasonable searches and seizures"), amend. V (guaranteeing freedom from forced self-incrimination), and amend. VI (guaranteeing the right to legal counsel in criminal proceedings).

To be sure, rights guaranteed by the Fourth, Fifth, and Sixth Amendments can also be waived. "[A] person may waive his Fourth Amendment protection by consenting to a warrantless search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)." *Windham v. State*, 599 So.2d 95, 96 (Ala.Crim.App. 1992). But the consent must be voluntary, *Ex parte Wilson*, 571 So.2d 1251, 1255 (Ala.1990), and the only consequence of the waiver is that "all evidence discovered during the consensual search may properly be admitted into evidence. *United States v. Wright–Barker*, 784 F.2d 161, 176 (3d Cir. 1986)." *Colbert v. State*, 615 So.2d 1213, 1214 (Ala.Crim.App.1992), *rev'd on other grounds*, 615 So.2d 1218 (Ala.1992). Likewise, a person in police custody may waive his Fifth and Sixth Amendment rights. Before he does so, however, he is entitled to receive a warning as set forth in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and its proge-

ny. Moreover, the waiver must be made "voluntarily, knowingly, and intelligently," *Ex parte Pardue,* 661 So.2d 268, 269 (Ala. 1994), and the only unalterable consequence of the waiver is that " '[a]ny statement given freely and voluntarily without any compelling influences [will be] ... admissible in evidence.' " *Ex parte Godbolt,* 546 So.2d 991, 996 (Ala.1987) (*quoting Miranda* ).

Thus, the waiver of rights guaranteed by Amendments Four, Five, and Six is not punitive, as is the case with the specific enforcement of an arbitration provision to which a consumer is ultimately required to acquiesce in order to avoid losing the value of the time he expended and the expense he incurred in negotiations before learning of the arbitration requirement. Because arbitration provisions are, in consumer transactions, such as the one hypothesized above, virtually "foisted" upon unsuspecting and unsophisticated consumers, and because the result is often punitive to the consumer, the right guaranteed by the Seventh Amendment is accorded less deference than those rights guaranteed by the Fourth, Fifth, and Sixth Amendments.

The fact that the United States Supreme Court has never held the Seventh Amendment to be binding on the states through the Fourteenth Amendment, as it has certain other of the Bill of Rights guarantees, is irrelevant in this context. This is because the FAA is not a state law. Thus, the constitutional deprivation, where one can be shown, derives from an act of Congress, not a state legislature. The Seventh Amendment, like the other Bill of Rights provisions, was ratified as a limitation on the power of Congress. Clearly, Congress had no power to deprive a citizen of Alabama of his right to a trial by jury before the Fourteenth Amendment was ratified— a fortiori, it has none now. Therefore, whether the Seventh Amendment is binding on the states is entirely irrelevant in any consideration of the FAA.

But it has been said, and rightly so, that "[p]robably no greater encomiums or panegyrics have ever been pronounced upon any legal or civil right than upon this right of trial by jury." *Alford v. State ex rel.*

*Attorney General,* 170 Ala. 178, 187, 54 So. 213, 215 (1910) (Mayfield, J., dissenting). "[I]t has been from very early time insisted upon, by our ancestors, as 'the great bulwark of their civil and political liberties,' and watched with unceasing jealousy and solicitude...." *Id.* "[T]he Constitution of the United States would have been justly obnoxious to the most conclusive objection if it had not recognized and confirmed it in the most solemn terms...." *Id.* (Emphasis added.)

For these reasons, I would hold that in a consumer-transaction case involving a contract containing an arbitration provision, unless there is a showing that the consumer entered the arbitration agreement voluntarily, the contract will be unenforceable as an encroachment on the right to trial by jury. I offer the following comments as guidance to parties desiring to avoid this result.

If the offeror of consumer goods or services intends to insist upon the arbitration of disputes arising out of its consumer transactions, it must clearly integrate the arbitration requirement with the terms of the transaction that the consumer would consider essential, such as the price of the goods or services and the size and number of the payments. In other words, the consumer must be apprised of his right to a trial by jury and must be given an opportunity to accept or reject arbitration in a manner similar to the choice commonly given consumers either to purchase or refuse credit life or disability insurance. Such a procedure is merely analogous to the warning given pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), to ensure that other enumerated rights under the Bill of Rights have been voluntarily waived. This would provide one way in which objective evidence as to the level of volition could be demonstrated.

*Id.* at 933–35 (Cook, J., concurring specially). Justice Almon recently stated in *McNaughton v. United Healthcare Servs., Inc. (Ex parte McNaughton),* No. 1961708, 1998 WL 544926, —— So.2d —— (Ala.1998):

Significant questions in these respects have never been addressed regarding an application of the FAA that deprives individuals of the right of trial by jury based upon a fanciful notion that the individual has "voluntarily" waived that right. . . . The United States Supreme Court has not addressed the application of the Seventh Amendment to the FAA. Even if the Seventh Amendment does not protect a litigant's right of trial by jury in a state court, surely that right is protected by the Tenth Amendment, quoted above, and the Ninth Amendment. . . . If a state guarantees its citizens the right of trial by jury in civil cases, the power of Congress to regulate commerce should not be taken to supersede all the constitutional protections of the rights of access to court, to due process of law, and to trial by jury. These points seem so fundamental and so obvious to me that I am amazed that they have not heretofore been raised and addressed in the recent flurry of litigation over the Federal Arbitration Act.

*Id.* at *9–10, ————.

The challenge for the Court is to address the above concerns and apply the current applicable law. For decades, the FAA was only applied to negotiated contracts between parties of equal bargaining power. Then the courts began to apply it to broader fact patterns involving consumer transactions. In *Allied–Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995), the Supreme Court applied the FAA to a consumer contract to provide termite control services to a homeowner. While this Court may think this extension is beyond the intent of Congress in enacting the FAA, we must follow the rule of law.

The parties briefed the issues before the Court. Oral arguments were heard on September 15, 1998 and October 13, 1998. Upon consideration of the record, the submission of the parties, the arguments of counsel, and relevant statutory and case law, this Court finds that the Defendants' Motions to Stay the Proceedings and Compel Arbitration should be denied.

## II. FINDINGS OF FACT.

This litigation has its origins in the purchase of an automobile by the Plaintiff. On August 7, 1995, Roy Knepp purchased a 1990 Pontiac Grand Am from Pokey Brimer Auto Sales ("Brimer"). He financed the purchase through Credit Acceptance Corporation ("CAC") for a total payment of $13,339.88. The Plaintiff states that the Defendants required him to buy property insurance on the collateral through MeritPlan Insurance Company ("MeritPlan"). He alleges that the premium was added to the loan balance and included in the amount financed through CAC. The amount actually financed was $8,793.50. Knepp maintains Brimer required him to pay a $175.50 fee to public officials and a $50.00 "doc fee." In addition, Brimer sold him a service contract in the amount of $595.00 from Wynn Oil Company. He contends Brimer represented to him that all the above fees were paid to others on his behalf when, in fact, Brimer kept all, or a portion, of those fees.

A Buyer's Order contained the following clause:

D. The undersigned acknowledges and agrees as follows: (1) that the vehicle was manufactured outside of Alabama; has operated and will continue to operate on interstate highways; has been heretofore traveling in interstate commerce; and if a service repair contract has been obtained by the undersigned in connection with this transaction (which has been issued or extended by entities located outside of the state of Alabama) which provide for service and/or repairs (as called for in service repair contract) in states outside of Alabama, and that the undersigned contemplates substantial interstate activity in connection with such service repair contract, and repairs thereunder; and that the undersigned contemplates that this transaction will have a substantial impact upon interstate commerce; (2) that in the event any dispute(s), under the terms of this contract of sale arise, (including but not limited to, the terms of the agreement, the condition of the motor vehicle sold, the conformity of the motor vehicle sold to the contract, the representations, promises, undertakings or

covenants made by dealer in connection with the sale of the motor vehicle, or otherwise dealing with the motor vehicle, any terms of financing in connection therewith, or any terms of any credit life and/or disability insurance purchased simultaneously herewith or extended service or maintenance agreements(s)) that dealer and the purchaser agree to submit such dispute(s) to binding arbitration, pursuant to the provisions of 9 U.S.C. 51, ET SEQ. and according to the commercial rules of the American Arbitration Association then existing in the county in Alabama where this sale is consummated. . . .

(Buyer's Order ¶ D). At the bottom of the Buyer's Order were two lines for signatures. The Plaintiff signed on one line but the other line was left blank.

Subsequently, the Plaintiff filed a Chapter 13 petition on January 27, 1998. He filed this adversary proceeding against Pokey Brimer Auto Sales, MeritPlan Insurance Company, Credit Acceptance Corporation, and Wynn Oil Products. The Complaint alleges fraud regarding the sale of excessive property insurance, service contract, doc fee and fee to public officials; violations of the Alabama Mini–Code; fraud; and civil conspiracy. He seeks compensatory, statutory and punitive damages. This Court confirmed the Knepps' Chapter 13 plan which provided that funds recovered from this litigation be distributed by the Standing Trustee pursuant to the plan's provisions. The plan further provides for the Plaintiff to pursue this litigation.

In response to the Complaint, Pokey Brimer filed a Motion to Compel the Plaintiff to submit to arbitration. Wynn filed a joinder to Brimer's motion. MeritPlan filed a Motion to Dismiss or, in the Alternative, to Stay Proceedings and Compel Arbitration. This Court requested the parties submit briefs on the Motion to Compel Arbitration and heard oral argument at a hearing on September 15. On September 22, 1998, this Court entered an order granting the Motions to Compel Arbitration and staying the proceedings until conclusion of the arbitration hearing. On the same day, the parties entered an order stipulating to the dismissal of Defendant Pokey

Brimer. The Plaintiff filed a Motion for Reconsideration of the order entered on September 22, 1998 pursuant to Fed.R.Bankr.P. 9023.

Next, the Plaintiff filed an Application of Default Entry and Motion for Default Judgment against Credit Acceptance Corporation on September 23, 1998. The Clerk's Office entered default on September 24, 1998. CAC filed a Motion to Set Aside Entry of Default on September 30, 1998 along with a Motion to Compel Arbitration. In an order entered October 26, 1998, this Court denied the Motion for Default Judgment; granted the Motion to Set Aside Default; and granted the Motion For Reconsideration, which was treated as a Fed.R.Civ.P. 59 motion.

## III. FEDERAL ARBITRATION ACT

■ Under the Federal Arbitration Act, 9 U.S.C. § 1, et seq., an arbitration provision "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity. . . ." 9 U.S.C. § 2. If a dispute falls within the scope of an arbitration provision, then upon application by one of the parties, the court must stay the trial of such action until completion of arbitration. 9 U.S.C. § 3. The Act's purpose is to ."revers[e] centuries of judicial hostility to arbitration agreements." *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 510, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974). To accomplish this goal, arbitration agreements are placed "upon the same footing as other contracts." *Id.* (*quoting* H.R.Rep. No. 96, 68th Cong., 1st Sess., 1, 2 (1924)).

■ In the 1980's, the Supreme Court visited the issue of arbitration on several occasions. The holdings of these cases established the "federal policy favoring arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Of particular significance is the Court's holding in *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987). In that case, the Supreme Court addressed two questions: (1) whether a claim brought under § 10(b) of the Securities Exchange Act of 1934 must be sent to arbitration in accordance with

the terms of an arbitration agreement; and (2) whether a claim brought under the Racketeer Influenced and Corrupt Organizations Act (RICO) must be sent to arbitration pursuant to an arbitration agreement. *Id.* at 222, 107 S.Ct. 2332. The Court began its analysis by noting that the "duty to enforce arbitration agreements is not diminished when a party bound by an agreement raises a claim founded on statutory rights." *Id.* at 226, 107 S.Ct. 2332. The Court concluded:

> The Arbitration Act, standing alone, therefore mandates enforcement of agreements to arbitrate statutory claims. Like any statutory directive, the Arbitration Act's mandate may be overridden by a contrary congressional command. The burden is on the party opposing arbitration, however, to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue. (citation omitted) If Congress did intend to limit or prohibit waiver of a judicial forum for a particular claim, such an intent 'will be deducible from [the statute's] text or legislative history,' or from an inherent conflict between arbitration and the statute's underlying purposes. (citations omitted)

*Id.* at 226–27, 107 S.Ct. 2332. *McMahon* provides us with this test to use in determining whether to enforce arbitration agreements involving statutory claims: for a statutory claim to not be arbitrable, the party opposing arbitration must demonstrate that Congress intended to prohibit or limit waiver of the judicial forum. If the party is unable to do so, then it must demonstrate that an "inherent conflict" exists between the FAA and the statute's underlying purposes.

 The court, not an arbitrator, must decide whether an arbitration provision is enforceable. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). However, the court must keep in mind the strong federal policy favoring arbitration. *Cone,* 460 U.S. at 24, 103 S.Ct. 927. Any doubts regarding

the enforceability of an arbitration provision should be resolved in favor of arbitration. *Id.* The Supreme Court interprets the FAA to require arbitration clauses be rigorously enforced. *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 221, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). Courts, however, must keep in mind that arbitration clauses are a matter of contract law. Thus, a party cannot be compelled to arbitrate any dispute which he or she has not agreed to submit to arbitration. *AT & T Technologies, Inc., v. Communications Workers of America,* 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986).

 The Plaintiff raises four specific arguments against the enforcement of this particular arbitration clause: (1) arbitration denies a party the right to a jury trial; (2) arbitration denies him substantive due process; (3) the defendants are non-parties to this arbitration clause and therefore have no standing to assert any rights under it; and (4) the arbitration provision is fatally flawed. If an arbitration agreement exists, the Plaintiff bears the burden of demonstrating why it should not bind the parties. *McMahon,* 482 U.S. at 225–26, 107 S.Ct. 2332. This Court cannot address issues directed at the contract as a whole but is limited to issues directed at the arbitration agreement. *Prima Paint,* 388 U.S. at 404, 87 S.Ct. 1801. When the Plaintiff raises contractual arguments, this Court must apply Alabama law governing the formation of contracts while keeping in mind the strong federal policy favoring arbitration. *Randolph v. Green Tree Fin. Corp.,* 991 F.Supp. 1410, 1421 (M.D.Ala.1997).

## IV. WHETHER THE ARBITRATION AGREEMENT IS GOVERNED BY STATE LAW OR FEDERAL LAW.

 The first issue before this Court is whether state law or the FAA applies in this instance. Section 8–1–41 of the Alabama Code provides that a pre-dispute agreement to submit future disputes to arbitration cannot be specifically enforced.[1] Thus, the reso-

---

1. **§ 8–1–41 Obligations which cannot be specifically enforced.**
 The following obligations cannot be specifically enforced:

(3) An agreement to submit a controversy to arbitration.

lution of these motions depends upon whether the FAA applies and, if so, whether it preempts state law. The test for determining whether the FAA applies is: (1) there must be a written arbitration agreement; and (2) the underlying transaction must involve interstate commerce. 9 U.S.C. § 2; *Cosmotek Mumessillik Ve Ticaret Ltd. Sirkketi v. Cosmotek USA, Inc.*, 942 F.Supp. 757 (D.Conn.1996). If the movants are able to demonstrate that the agreement involved interstate commerce, then the FAA applies and state law is preempted. *Ex parte Jones*, 628 So.2d 316, 317 (Ala.1993).

■ This Court concludes that if an agreement exists, it is subject to the FAA. There is a written arbitration clause in this instance, albeit, one that is not signed by either the seller or the movants.[2] As to the second requirement, this Court must determine whether the transaction involved interstate commerce. The Supreme Court has addressed the issue of what constitutes involvement in interstate commerce. In *Allied–Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995), the Court determined that the FAA reached to the limits of Congress's power to regulate interstate commerce. *Id.* at 268, 115 S.Ct. 834. The Defendants accurately state that the test is whether the transaction involved or affected interstate commerce. *Id.* at 273–75, 115 S.Ct. 834. The Alabama Supreme Court has stated, "[T]he FAA is broadly construed so that the smallest connection of an arbitration agreement with interstate commerce is sufficient to bring the agreement within the FAA." *Med Center Cars v. Smith*, 1998 WL 560255 at *2, 727 So.2d 9, —— (Ala.1998).

■ Significantly, the arbitration agreement provides that this transaction involved substantial interstate commerce. (Buyer's Order Additional Terms and Conditions, ¶ D). When a contract expressly provides that the transaction involves interstate commerce within the meaning of the FAA, a court will and must enforce the stipulation and apply the FAA as to the arbitration

agreement contained in the contract. *Staples v. Money Tree, Inc.*, 936 F.Supp. 856, 858 (M.D.Ala.1996). This Court concludes that if an agreement exists, it is subject to the FAA and state law is preempted.

## V. WHETHER THE ARBITRATION CLAUSE IS VALID AND ENFORCEABLE.

The next issue this Court must address is whether the arbitration clause is valid and enforceable. The Supreme Court has stated that the question of validity of an arbitration agreement is one for the courts, *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). The Plaintiff maintains that the agreement to arbitrate is fatally flawed for three reasons. First, there is no legible signature on the document. Second, the document is not signed by any of the movants or the dealer, Pokey Brimer. Third, the document is not dated and does not reference any transaction or incorporate any other documents by reference. The Plaintiff offers argument only on the second point. He correctly maintains that the determination of whether the parties agreed to arbitrate their disputes in generally determined by state law principles that govern the formation of contracts. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995).

There are three questions which the Court must attempt to answer. The first question is whether under Alabama law, the dealer is required to sign an arbitration clause. The second question that must be decided is whether this particular arbitration agreement required the signature of the dealer. Third, this Court will address the issue of the "separability doctrine" and its effect on the validity of this arbitration clause.

Initially, the Plaintiff argues that the Buyer's Order is not enforceable due to a lack of assent. He cites a recent Alabama Supreme Court case for the proposition that a dealer, who fails to sign an arbitration clause and who later seeks to enforce it, cannot enforce the arbitration clause. *In Med Center Cars, Inc. v. Smith*, 727 So.2d 9 (Ala.1998), the

---

**2.** The Court will discuss the issue of whether an agreement was entered later.

court determined whether the arbitration clause was enforceable when the dealer failed to sign the agreement as required by the contract. In that case, the purchaser signed the Buyer's Order which contained a phrase "Not valid unless accepted by seller or its authorized representative. ACCEPTED BY SELLER: MED CENTER CARS, INC. d/b/a MED CENTER MAZDA BY: _____". The dealer did not sign the order. The court determined that the company could not enforce the order due to its failure to sign as required by the contract. *Id.* at *6, — So.2d at —. In the instant case, the Buyer's Order contains a blank line but does not contain a phrase *specifically* requiring the dealer to sign. This factor distinguishes this case from *Med Center Cars.*

*Med Center Cars* cites for support *Crown Pontiac, Inc. v. McCarrell,* 695 So.2d 615 (Ala.1997). In that case, the purchaser went to look at used cars at a dealership. The salesman wrote up a Buyer's Order with specific terms and conditions. The purchaser signed the arbitration clause on the Order but continued to look at other dealerships for a vehicle. He later returned to purchase the car. The salesman used the first Buyer's Order to prepare a new Order which contained different terms and conditions from the original. The purchaser signed the new contract but did not sign the arbitration clause. The issue before the Alabama Supreme Court was whether a preliminary document containing the purchaser's signature became part of the later-executed contract. *Id.* at 616. The court considered whether the arbitration clause in the second Buyer's Order was enforceable simply by being included in the form. The court determined it could not be enforced because the lack of a signature demonstrated a lack of mutuality of assent. *Id.* at 618–19.

This Court must decide whether, under Alabama law, the seller was required to sign the arbitration clause for it to be enforceable. The Buyer's Order contained two lines for signatures. The Plaintiff signed one line while the other was left blank. The parties

did not provide any evidence indicating whether the signature lines were for the purchaser and/or a co-debtor to sign or were for the dealer and purchaser to sign. The cases above, if read narrowly, suggest that a Buyer's Order must be signed by both parties *if* the contract specifically requires it. A broader reading suggests that an arbitration clause that is unsigned by both parties does not become a part of the overall agreement.

 In Alabama, the purpose of a signature is to show "mutuality and assent." *McCarrell,* 695 So.2d at 618. If the Statute of Frauds requires a writing to be signed, then a memorandum need not be signed by both parties. It is sufficient that the party charged or against whom enforcement is sought signs the agreement. E. ALLAN FARNSWORTH, CONTRACTS, § 6.8 at 435 (2d ed.1990). Under the holdings in *McCarrell* and *Med Center Cars,* however, if the agreement requires both the signature of the purchaser and the seller and one is lacking, then there is no agreement.

 It should be emphasized that the presumption favoring arbitration is not applied to the preliminary question of whether the parties agreed to arbitrate. *Allstar Homes, Inc. v. Waters,* 711 So.2d 924, 928 (Ala.1997). The Defendants bear the burden to demonstrate that there is "clear and unmistakable evidence" that there was an agreement to arbitrate between the parties.[3] *Id.* at 928–29.

The Alabama Supreme Court has stated that an unsigned endorsement which contains an arbitration clause is valid if it is attached to the policy and is referenced therein. *Rager v. Liberty Nat'l Ins. Co. (Ex parte Rager),* 712 So.2d 333, 335 (Ala.1998). In *Rager,* the court faced the issue of whether a plaintiff was required to arbitrate a dispute when he did not sign an endorsement containing an arbitration clause. The plaintiff applied for a "hospital accident policy" from the defendant. The company approved his application and sent him a copy of his policy. He was later injured in an accident and the company initially refused to pay for coverage. As a result

---

**3.** Generally, the burden is on the movant to demonstrate to the court that the dispute is arbi-

trable. 4 AM.JUR.2D *Alternative Dispute Resolution* § 122 (1995).

of the denial, he sued the company. Subsequently, the company moved to have the proceedings stayed and the matter determined by arbitration.

The plaintiff argued that he never agreed to arbitrate his claims with the company. The court rejected this argument. Attached to the policy was an endorsement which contained an arbitration clause. The plaintiff maintained this could not be enforced because he never signed the endorsement. The court held that an unsigned endorsement is valid if it is attached to the policy and referenced therein, as it was in that case. *Id.* at 335. The court concluded that endorsement was a valid part of the policy and must be enforced. *Id.*

However, if the contract does not clearly reference the arbitration agreement, arbitration should not be compelled. Justice Kennedy stated:

> It would be fundamentally unjust for this Court to articulate a standard whereby the citizens of this state, when entering contracts, would be required to leap from document to document searching for provisions that, in amongst the fine print and voluminous documentation, might operate to deprive them of their fundamental rights without their acknowledged consent.

*Ex parte Bentford,* 719 So.2d 778, 781 (Ala. 1998). In this case, there is no evidence before the Court that any party attached the Buyer's Order to the sales and installment contract or executed contemporaneously. Further, the contract does not refer to the Buyer's Order at all. Thus, the Defendants have failed to provide evidence to this Court with which it could find the Buyer's Order was enforceable. The Court finds that there is insufficient evidence to determine that the arbitration clause is enforceable.

The analysis should not stop there, however. The Alabama Supreme Court has not yet considered the "separability doctrine" when determining whether to enforce arbitration clauses. Ordinarily, it is not significant that the sales contract does not specifically incorporate the Buyer's Order: "[I]t is well-settled that 'two or more instruments executed contemporaneously by the same parties in reference to the same subject matter constitute one contract and should be read together in construing the contract.'" *Pacific Enters. Oil Co. (USA) v. Howell Petroleum Corp.,* 614 So.2d 409, 414 (Ala.1993) (*quoting Haddox v. First Alabama Bank of Montgomery, N.A.,* 449 So.2d 1226, 1229 (Ala.1984)). The "separability doctrine," a legal fiction, pretends:

> "that when a party alleges it has formed a contract containing an arbitration clause, that party actually alleges it has formed two contracts. In addition to the contract really alleged to have been formed (the container contract), the separability doctrine pretends that the party also alleges a fictional contract consisting of just the arbitration clause, but no other terms."

Stephan L. Ware, *Arbitration and Unconscionability After Doctor's Associates, Inc. v. Casarotto,* 31 WAKE FOREST L.REV. 1001, 1010 (1996); *see Allstar Homes, Inc. v. Waters,* 711 So.2d 924, 933–34 (Ala.1997) (arbitration clause is a separate agreement modifying the first agreement). Under this doctrine, a arbitration clause must fulfill all the requirements of a contract including mutuality of assent and cannot rely on the container contract for these elements.

This Court must look to the arbitration clause to determine whether both parties were required to sign it. The agreement begins with the statement, "[T]he undersigned acknowledges and agrees...."(Buyer's Order ¶ D). Further on it states, "that dealer and purchaser agree to submit such dispute(s) to binding arbitration...." *Id.* It is apparent that both parties are to bound by the terms of the arbitration agreement thus, the term, "the undersigned," must include both the purchaser and dealer. This, along with the two separate lines for signatures leads the Court to conclude that the Buyer's Order required both parties to sign the agreement and without both signatures there is no agreement to arbitrate the issues.

The Court concludes that the Defendants have failed to demonstrate by a preponderance of evidence that the parties agreed to arbitrate any disputes. In addition, the separability doctrine requires the Court to consider the arbitration clause as a separate

contract from the rest of the agreement and without the dealer's signature there is a lack of mutuality of assent. As there is no arbitration agreement between the parties, the arbitration provision is not enforceable. Consequently, the first prong of the FAA test is not met and Alabama law controls. ALABAMA CODE § 8–1–41 (1975) would prevent the enforcement of the arbitration clause, but in this instance there is nothing to enforce.

## VI. WHETHER THE ARBITRATION AGREEMENT IS UNCONSCIONABLE.

▇▇▇ Although this Court has determined that there was no agreement to arbitrate, it will address the issues raised in the briefs and at oral argument because these issues are being raised in a great number of cases. The next issue is whether the arbitration clause is void under the doctrine of unconscionability. Alabama law does not have an explicit standard for determining unconscionability. *Roberson v. The Money Tree of Alabama, Inc.* 954 F.Supp. 1519, 1524 n. 7 (M.D.Ala.1997). In determining whether an arbitration clause is unconscionable, Alabama courts utilize four factors: (1) whether there is an absence of meaningful choice on one party's part; (2) whether the contractual terms are unreasonably favorable to one party; (3) whether there was unequal bargaining power among the parties; and (4) whether there were oppressive, one-sided, or unfair terms in the contract. *Rollins, Inc. v. Foster,* 991 F.Supp. 1426, 1434 (M.D.Ala.1998). This Court is limited to determining whether the arbitration clause is unconscionable and not the contract as a whole. *Id.* at 1435. This Court must determine "whether the arbitration clause is so unfavorable to [Knepp] that it would not have been reasonable for [him] to knowingly to accept it, given any meaningful choice." *Roberson,* 954 F.Supp. at 1525. The Plaintiff bears the burden of proving unconscionability. This Court requested all the parties brief the issue of unconscionability. The Defendants complied but the Plaintiff, however, not only did not raise the issue, but declined the opportunity to brief it.

▇▇▇ The Alabama Code provides:

(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

(2) When it is claimed *or appears to the court* that the contract or any clause thereof may be unconscionable, the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination. (emphasis added)

ALABAMA CODE § 7–2–302 (1975). In interpreting an identical section of the Uniform Commercial Code, the Eighth Circuit concluded "[T]he plain language of subsection (1) permits the court to raise this issue sua sponte." *Langemeier v. National Oats Co.,* 775 F.2d 975, 977 (8th Cir.1985). This Court agrees with the Eighth Circuit's conclusion.

The same subsection, however, mandates that the parties be given a "reasonable opportunity" to present evidence to aid the court in making its decision. *Id.* The parties did not request an opportunity to present evidence. This fact, coupled with the Plaintiff's failure to brief this issue, limits the Court's inquiry to the face of the arbitration clause to determine whether it is unconscionable.

▇▇▇ Contracts of adhesion are not ipso facto invalid. *Rollins,* 991 F.Supp. at 1435; *Roberson,* 954 F.Supp. at 1526 n. 10. A finding of relief based on unconscionability is an extraordinary remedy: one that is reserved for situations where the four factors are fulfilled. *Goodwin v. Ford Motor Credit Co.,* 970 F.Supp. 1007, 1013 (M.D.Ala.1997). The first factor to be considered is whether there is a lack of meaningful choice on the part of the consumer. In today's market it is

virtually impossible to purchase a new or used automobile without the sales contract containing an arbitration provision. As this Court noted in its introduction, consumers are faced with a stark and unrelenting choice today:

> The reality is that contracts containing these provisions appear with increasing frequency in today's marketplace. As a result, consumers find it increasingly difficult to acquire basic goods and services without forfeiting their rights to try before a jury the common-law claims that may accrue to them. Entire segments of the market for certain goods and services, such as automobile sales and their attendant necessary financing, are being closed to consumers who are unwilling to forfeit the rights guaranteed them by the federal and state constitutions. To sanction this market closure would essentially effect the repeal of the Seventh Amendment by the concurrence of judicial with legislative fiat.

*Allstar Homes, Inc. v. Waters,* 711 So.2d 924, 933 (Ala.1997) (Cook, J. concurring). Wynn Oil Company in their brief states, "[I]t would be a great hindrance to commerce if companies, particularly those serving a large population, were required to negotiate each contract item with each customer." (Wynn Oil Co.'s Supplemental Br. at *4). This leads the Court to conclude that consumers lack a meaningful choice today, particularly when they are purchasing a motor vehicle.

The second factor to be considered is whether the contractual terms are unreasonably favorable to one party. This Court finds the contract terms unreasonable because they require a consumer to give up access to the courts, forsake his rights and constitutional protections to participate in arbitration which requires the payment of fees. As Justice Cook points out in *Allstar Homes* a consumer form contract does not constitute a knowing, voluntary and informed waiver of important legal rights. The third factor involves the relative bargaining power of the parties. *Id.* at 933–35. Few consumers have the bargaining expertise or power of a dealer. Automobiles are a necessity in our soci-

ety and consumers can ill afford to forsake this necessity even at the price of their constitutional rights.

The fourth factor involves the terms of the contract. This Court finds it is oppressive to a debtor seeking a fresh start to be required to pay initial fees for arbitration ranging from $500.00 to $7,000.00 and daily costs of hundreds of dollars when the court system will provide the same dispute resolution with the same degree of or even greater expertise for free.[4] *See Paladino v. Avnet Computer Techs., Inc.,* 134 F.3d 1054, 1062 (11th Cir. 1998) (when an arbitration clause has provisions that defeat the remedial purpose of a statute, it is not enforceable); *Rhode v. E & T Invs., Inc.,* 6 F.Supp.2d 1322, 1328 (M.D.Ala.1998); *Rollins,* 991 F.Supp. at 1437 (when a party who is in an inferior bargaining position is compelled to assert her claims in arbitration thus precluding a remedy in the less expensive public fora and the costs of the arbitral forum render the party unable to pursue her claim, the clause is oppressive and one-sided and therefore unconscionable). This Court entered an order confirming the Plaintiff's Chapter 13 plan on October 22, 1998. In granting confirmation, this Court found that the Plaintiff is paying all disposable income to fund the plan. Therefore, it is evident that the Plaintiff does not have the funds to pay for arbitration. Thus, this Court finds that the arbitration clause is unconscionable and unenforceable due to the Plaintiff's inability to pay for arbitration.

## VII. WHETHER ARBITRATION AGREEMENTS VIOLATE PUBLIC POLICY AND DEPRIVE THE PLAINTIFF OF HIS CONSTITUTIONAL RIGHTS.

### A. Whether Courts have expanded the scope of the FAA beyond Congress's original intent.

■ The Plaintiff maintains that the FAA's legislative history demonstrates that

---

**4.** One of the Defendants, Wynn Oil Company, stated in its brief that the Defendants would pay the expenses for arbitration subject to reimbursement if recovery was had by the Plaintiff. (Def.'s Supp.Br. at 13) The Defendant, however, failed to file any notice with the Court of its intentions. Neither the Court nor the Plaintiff can rely upon a promise contained in a brief.

Congress did not intend the Act's scope to be so broadly construed. Congress intended the Act to apply primarily to contracts between merchants and never intended it to apply to consumer contracts of adhesion.[5] Further, Congress never intended it to apply in state courts. The essence of this argument is that the Supreme Court has incorrectly interpreted the Federal Arbitration Act. While this Court is sympathetic to this argument,[6] it declines to accept it. The Plaintiff is asking this Court to ignore a basic legal principle: the Supreme Court of the United States is supreme in its exposition of federal law. *Cooper v. Aaron*, 358 U.S. 1, 18, 78 S.Ct. 1401, 3 L.Ed.2d 19 (1958); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803); *Lopez v. Heckler*, 725 F.2d 1489, 1497 n. 5 (9th Cir.1984); *Kelley v. Metropolitan County Bd. of Educ. of Nashville and Davidson County*, 687 F.2d 814, 824 (6th Cir.1982); *Thomas v. Heckler*, 598 F.Supp. 492, 496 (M.D.Ala.1984). This Court is bound by the Supreme Court's interpretation of the FAA.

**5.** The legislative history of the Federal Arbitration Act ("FAA") reflects that the FAA was never intended to apply to the type of consumer contracts of adhesion in which arbitration is now being enforced with increasing frequency. Further, there is substantial evidence that the FAA was never intended to apply in state courts. Instead of adhering to the legislative intent, however, the courts have exponentially expanded the application and scope of the FAA.

In *Allied–Bruce Terminix Companies v. Dobson*, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995), Justice O'Connor observed:

I continue to believe that Congress never intended the Federal Arbitration Act to apply in state courts, and that this Court has strayed far afield in giving the Act so broad a compass. (citation omitted) We have often said that the pre-emptive effect of a federal statute is fundamentally a question of congressional intent.... Yet, over the past decade, the Court has abandoned all pretense of ascertaining congressional intent with respect to the Federal Arbitration Act, building instead, case by case, an edifice of its own creation. (citation omitted) I have no doubt that Congress could enact, in the first instance, a federal arbitration statute that displaces most state arbitration laws. But I also have no doubt that, in 1925, Congress enacted no such statute.

Today's decision caps this Court's effort to expand the Federal Arbitration Act. Although

## B. Whether the expanding use of binding arbitration has led to the privatization of our judicial system.

The Plaintiff's argument consists solely of an extended quote from a law review article. The author's main premise is that the Supreme Court's recent decisions discussed above have placed consumers' and employees' due process, jury-trial and Article III rights in serious jeopardy. The general issue, the privatization of our judicial system, is a public policy argument. Trial court must consider these paramount issues and may narrowly apply Common Law that restricts such precious rights, however, they must follow binding precedent. The introduction to this opinion outlines the public policy concerns. The courts must balance ancient and precious rights against the right to contract.

## C. Whether Binding Arbitration Clauses Result in an Unknowing and Involuntary Waiver of the Right to A Jury Trial.

The Plaintiff correctly maintains that the right to a jury trial is guaranteed by

each decision has built logically upon the decisions preceding it, the initial building block in *Southland Corporation v. Keating*, 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984) laid a faulty foundation.... It remains now for Congress to correct this interpretation if it wishes to preserve state autonomy in state courts. 513 U.S. at 283–84, 115 S.Ct. 834 (O'Connor, J., concurring). *See also Allied–Bruce Terminix Companies v. Dobson*, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995) (Thomas, J., dissenting); *Perry v. Thomas*, 482 U.S. 483, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987) (O'Connor, J., dissenting).

In addition, there is substantial legislative history to support a much more limited scope of the FAA than that employed by most courts today. Justice Cook quotes extensively from the legislative history in his concurrence in *Allstar Homes* to demonstrate this point. *Allstar Homes, Inc. v. Waters*, 711 So.2d 924, 930–32 (Ala.1997) (Cook, J. concurring).

**6.** In a law review article, Professor Jean Sternlight gives a scholarly review of the judicial interpretations and concludes that the United States Supreme Court has incorrectly interpreted and applied the FAA. *See,* Jean Sternlight, *Rethinking the Constitutionality of the Supreme Court's Preference for Binding Arbitration: A Fresh Assessment of Jury Trial, Separation of Powers, and Due Process Concerns,* 72 Tul.L.Rev. 1 (1997).

both the Alabama state constitution[7] and the Constitution of the United States.[8] While critical to our legal system, the right to a trial by jury may be waived. Any waiver of this right must be clear and explicit. The Plaintiff, however, failed to request a jury trial in his Complaint and thus, he lacks standing to bring this argument. Jury trials are rarely invoked in this Court. To attack the constitutionality of a statute, a party must demonstrate that he has been injured or potentially injured by it. *Carolina Envtl. Study Group v. United States Atomic Energy Comm'n*, 431 F.Supp. 203, 218 (W.D.N.C. 1977). The focus must be on whether the litigant is the proper party to fight the lawsuit, not whether the issue itself is justiciable. *Id.* As the Plaintiff failed to claim his right to a jury trial, he is unable to demonstrate any injury or potential injury to himself.

■ Further, the Plaintiff cannot avail himself of the limited exception of third-party standing to assert a claim on behalf of a third-party. He seeks to bring this adversary proceeding as a class action, a request this Court has not considered at this time. To assert a third-party claim, he must demonstrate that the other litigants suffered a concrete injury, that he has a close relationship with the third-party, and there exists some hindrance to the third-party's ability to assert his/her claim. *Georgia v. McCollum*, 505 U.S. 42, 55, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992). Because the plaintiff failed to request a trial by jury in his complaint, he is unable to demonstrate how any other party has been injured.

### D. Whether the practical aspects of binding arbitration leave consumers at a disadvantage.

The Plaintiff maintains that the arbitration clause limits or eliminates his ability to conduct extensive discovery. In support of his contention, he cites an Alabama Supreme Court case *Allstar Homes d/b/a Best Value Mobile Homes v. Waters*, 711 So.2d 924 (Ala. 1997). The court stated:

Although we do not address the full implications of waiving one's right to a trial by jury in favor of arbitration of disputes, we do point out that the due process safeguards found in judicial proceeding are largely absent in arbitration. The reputed informality and the relative speediness of an arbitration procedure are achieved by severely limiting discovery; imposing few evidentiary rules; giving the arbitrator almost unbridled discretion to make decisions without basing on established principles of law or making written findings to support the arbitrator's conclusions; and providing virtually no right of appeal in the case of error in the arbitrator's decision. *Id.* at 929 n. 1. It is here that Plaintiff raises the due process argument but fails to apply the facts or even argue his point.

■ Only action by the state, i.e. government action, is subject to scrutiny under the Due Process Clause. *National Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191, 109 S.Ct. 454, 461, 102 L.Ed.2d 469 (1988). Courts have reiterated on numerous occasions that constitutional due process protections do not extend to "private conduct abridging individual rights." *Id.* Courts must determine whether the State has provided a mantle of authority that enhanced the power of the harm-causing individual actor. *Id.* at 192, 109 S.Ct. 454. The Eleventh Circuit in *Davis v. Prudential Secs., Inc.*, 59 F.3d 1186 (11th Cir.1995), held that "the [state] action element of a due process claim is absent in private arbitration cases." *Id.* at 1191.

Several commentators have taken issue with this conclusion. Professor Richard Reuben maintains that the Supreme Court's state action decisions "seem to compel an understanding that, for constitutional purposes, ADR (i.e. arbitration) hearings can constitute state action when they are court-related or contractually enforced." Richard C. Reuben, *Public Justice: Toward a State Action Theory of Alternative Dispute Resolution*, 85 Cal.L.Rev. 577, 609 (1997). Utilizing the framework established by the Supreme Court in *Lugar v. Edmondson Oil*

---

7. Ala. Const. art. I § 11.

8. U.S. Const. amend. VII.

*Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)[9] and *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991)[10] he concludes that contractually compelled arbitration can be state action for constitutional purposes. *Id.* at 641.

Professor Jean Sternlight also rejects the reasoning of the Eleventh Circuit. She notes that many courts base their decisions on the belief that the parties voluntarily agreed to arbitrate their disputes. Jean R. Sternlight, *Rethinking the Constitutionality of the Supreme Court's Preference for Binding Arbitration: A Fresh Assessment of Jury Trial, Separation of Powers, and Due Process Concerns,* 72 Tul.L.Rev. 1, 44 (1997). Courts, in such instances, neutrally enforce such agreements. However, Sternlight maintains that the Supreme Court engaged in state action "when it interpreted the FAA to require courts to favor arbitration over litigation by interpreting ambiguous contracts to state a preference for arbitration rather than litigation." *Id.* The Court's requirement that traditional contract defenses be narrowly construed when applied to arbitration is another example of state action. *Id.* at 45. She concludes that "by adopting a preference for arbitration over litigation, and by using this preference as a rule of construction, Congress and the courts are restricting parties' access to litigation or other forums no less than if Congress had enacted a statute requiring private parties to take disputes to arbitration." *Id.* at 47.

■ It is not difficult to find state action in this case. Alabama law does not allow the specific performance of pre-dispute arbitration agreements.[11] Without the FAA and the strong presumption of arbitration, this agreement could not be enforced. Further, the party seeking arbitration must seek this Court's assistance to enforce the arbitration agreement. This Court believes the scholarly articles correctly address this issue. However, this Court is bound by the precedent in the Eleventh Circuit as stated in *Davis* and

finds that the Due Process rights of the Plaintiff have not been denied. *Davis,* 59 F.3d at 1191.

In addition, Plaintiff argues that binding arbitration interferes with class action relief and consequently eliminates any reasonable opportunity for effective redress. A number of federal courts and commentators also conclude that binding arbitration can effectively eliminate the ability of consumers to bring or participate in class action litigation. *See, e.g., Randolph v. Green Tree Financial Corp.,* 991 F.Supp. 1410 (M.D.Ala.1997); Kaplinsky and Levin, *Banks Can Use Arbitration Clauses As A Defense To Class Actions,* 7 Business Law Today 24 (May/June 1998); Dunham, *The Arbitration Clause As Class Action Shield,* 16 Franchise Law Journal 141 (Spring 1997). The Alabama Supreme Court recently joined those courts, which have held that arbitration is generally a bar to class action treatment. In *Med Center Cars, Inc. v. Smith,* 727 So.2d 9 (Ala.1998), the court held:

> This Court has not directly addressed the issue of classwide arbitration, and the FAA is silent as to that issue.... Although there are benefits to class-wide arbitration, such as efficient resolution of common claims and judicial economy, no persuasive authority permitting class-wide arbitration exists at this time.... Although the plaintiffs' contentions are practically appealing, after reviewing the authorities we conclude that to require class-wide arbitration would alter the agreements of the parties, whose arbitration agreements do not provide for classwide arbitration. While we can understand and applaud the efforts of the trial court to seek a method that would allow those parties claiming small amounts of damages to obtain a remedy, we are persuaded by the federal authority on this issue and hold that class-wide arbitration should not be permitted in this case.

9. 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).

10. 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991).

11. Alabama Code § 8–1–41 (1975). *See supra* note 1.

*Med Center Cars,* 1998 WL 560255 at *11, 727 So.2d at —— (citations omitted). If this approach prevails, the pervasive use of arbitration agreements in consumer contracts could have the effect of eliminating class actions as an option available to aggrieved consumers. If class actions are no longer an option, the vast majority of consumer claims involving relatively small sums of money on an individual basis will be left without a remedy.

The United States Supreme Court has repeatedly recognized the important role that class actions play in obtaining relief for plaintiffs with relatively small individual claims:

> Class actions also may permit the plaintiffs to pool claims which would be uneconomical to litigate individually. For example, this lawsuit involves claims averaging about $100 per plaintiff; most of the plaintiffs would have no realistic day in court if a class action were not available.

*Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 809, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). Similarly, in *Deposit Guar. Nat'l Bank v. Roper,* 445 U.S. 326, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980), the Court observed: "Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class action device." *Id.* at 339, 100 S.Ct. 1166.

■ In addition, the Supreme Court has also acknowledged that without the possibility of recovering an attorney's fee, most of these class actions would never be filed:

> A critical fact in this litigation is that petitioner's individual stake in the damage award he seeks is only $70. No competent attorney would undertake this complex antitrust action to recover so inconsequential an amount. Economic reality dictates that petitioner's suit proceed as a class action or not at all.

*Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 161, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). *In Deposit Guar. Nat'l Bank,* the Court noted:

> The use of the class-action procedure for litigation of individual claims may offer substantial advantages for named plaintiffs; it may motivate them to bring cases that for economic reasons might not be brought otherwise. Plainly there has been a growth of litigation stimulated by contingent-fee agreements and an enlargement of the role this type of fee arrangement has played in vindicating the rights of individuals who otherwise might not consider it worth the candle to embark on litigation in which the optimum result might be more than consumed by the cost. The prospect of such fee arrangements offers advantages for litigation by named plaintiffs in class actions as well as for their attorneys. For better or worse, the financial incentive that class actions offer to the legal profession is a natural outgrowth of the increasing reliance on the "private attorney general" for the vindication of legal rights; obviously this development has been facilitated by Rule 23.

*Deposit Guar. Nat'l Bank,* 445 U.S. at 338, 100 S.Ct. 1166. This Court concludes that the Plaintiff would be prejudiced in prosecuting this action as a class action if arbitration were enforced.

**E. Whether a Mandatory Arbitration Clause Deprives the Debtor of Access to the Bankruptcy Courts and Therefore is Void as a Matter of Public Policy.**

■ Courts have long held that a predispute agreement to waive benefits conferred by the bankruptcy laws is wholly void as against public policy. *See, e.g., Fallick v. Kehr,* 369 F.2d 899, 904 (2d Cir.1966); *In re Weitzen,* 3 F.Supp. 698 (S.D.N.Y.1933); *In re Club Tower, L.P.,* 138 B.R. 307, 312 (Bankr. N.D.Ga.1991); *In re Citadel Properties, Inc.,* 86 B.R. 275, 275 (Bankr.M.D.Fla.1988); *In re Gulf Beach Dev. Corp.,* 48 B.R. 40 (Bankr. M.D.Fla.1985); *In re Tru Block Concrete Products,* 27 B.R. 486, 492 (Bankr.S.D.Cal. 1983); *In re Adana Mortgage Bankers, Inc.,* 12 B.R. 989, 1009 (Bankr.N.D.Ga.1980); *In re Kriger,* 2 B.R. 19, 23 (Bankr.Or.1979); *In re George,* 15 B.R. 247, 248 (Bankr.N.D.Ohio 1981); *Federal Nat'l Bank v. Koppel,* 253 Mass. 157, 148 N.E. 379 (Mass.1925). Debtors have an "inviolate right of access to the courts of bankruptcy to seek rehabilitation."

*In re Mount Forest Fur Farms of America, Inc.,* 103 F.2d 69, 71 (6th Cir.1939); *In re Pine Tree Feed Co.,* 112 F.Supp. 124, 126 (D.Me.1953); *Adana,* 12 B.R. at 1009. In support of these contentions, courts cite the strong congressional policy of providing the honest, but unfortunate debtor, a fresh start. *See, e.g., Fallick,* 369 F.2d at 904; *Club Tower,* 138 B.R. at 312.

Courts have limited this rule to agreements which waive the debtor's right to file a bankruptcy petition. They generally do not extend it to a pre-dispute agreement between a debtor and creditor that waives only one right. *See, e.g. Club Tower, L.P.,* 138 B.R. at 311; *Citadel Properties,* 86 B.R. at 276; *Gulf Beach Dev.,* 48 B.R. at 43. For example, in *Club Tower,* the debtor secured a loan with which to finance construction of a high-rise apartment building. Sometime later, the debtor defaulted on the loan. The debtor and creditor entered into a Forbearance Agreement which had as a provision that the creditor would be entitled to immediate relief from the automatic stay in the event the debtor filed for relief under the Bankruptcy Code. The debtor ultimately filed for relief under the Bankruptcy Code. Judge Robinson found that the creditor was entitled to relief from stay under the Agreement. *Club Tower,* 138 B.R. at 312. He noted the significant difference between denying the debtor the right to file a petition under the Code and a pre-bankruptcy provision by which a debtor agrees to not oppose the granting of a motion for relief. *Id.* at 311. The agreement: (1) did not prohibit the debtor's filing for relief; (2) did not require the debtor waive all its rights and benefits under the Code; (3) allowed the debtor to retain the benefit of the stay as to the other creditors, its core rights, and the opportunity for a fresh start; and (4)

allowed the enforcing of pre-petition agreements and furthered the legitimate public policy of encouraging out of court restructurings and settlements. *Id.* at 311–12.

■ In the instant case, the arbitration clause did not limit the debtor's ability to file his petition under the Code. The clause is limited to disputes that arise around the purchase of the automobile. Under the reasoning stated above, the debtor has the right to waive his right to have this claim heard in a bankruptcy forum if he chooses. The debtor retained his right to pursue other claims against other creditors. Significantly, the public policy foundation of this rule of law, the right of an honest debtor to a fresh start, is not undermined by allowing arbitration of this one claim. Further, the debtor is entitled under the FAA to have a district court review the arbitration award, albeit in a limited manner.[12]

## VIII. WHETHER THE INCLUSION OF A MANDATORY ARBITRATION CLAUSE CREATES AN "INHERENT CONFLICT" WITH THE BANKRUPTCY CODE.

The Court requested the parties brief this issue. The Plaintiff acknowledges that the 1984 Amendments to the Bankruptcy Code limited the jurisdiction of bankruptcy courts, but the grant of jurisdiction is still very broad. Further, the costs of arbitration would adversely affect the administration of the estate and therefore negatively impact the creditors. In response, the Defendants offer several arguments. They request this Court adopt the Third Circuit holding in *Hays and Co. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 885 F.2d 1149 (3d Cir.

---

**12.** 9 U.S.C. § 10 provides:

(a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—

(1) Where the award was procured by corruption, fraud, or undue means.

(2) Where there was evident partiality or corruption in the arbitrators, or either of them.

(3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to

hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

(4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

(5) Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators.

1989). In *Hays,* the Third Circuit applied the *McMahon* test to a claim based on a statutory right and determined that, at least with non-core matters, arbitration does not conflict with the underlying purposes of the Bankruptcy Code. *Id.* at 1160–61. The Defendants maintain that this case, the one in *Hays,* is a non-core proceeding and therefore this Court's discretion in compelling arbitration is non-existent.

Courts have been called upon to determine whether the FAA conflicts with another statute on a number of occasions. In *Wilson v. Waverlee Homes, Inc.,* 954 F.Supp. 1530 (M.D.Ala.1997), *aff'd* 127 F.3d 40 (11th Cir. 1997), Judge Thompson addressed the issue of whether the FAA conflicted with the Magnuson–Moss Act.[13] The plaintiffs purchased mobile homes from a dealer which were manufactured by the defendant. Subsequently, they brought actions for breach of implied and express warranties and alleged the commission of various other torts against the defendant but not the dealer. Relying on an arbitration clause in the sales and finance contract signed by the dealer and the plaintiffs, the defendant sought to compel arbitration. The issue before the court was "whether a non-signatory warrantor to a commercial installment sales and finance contract containing an arbitration clause may use contract principles such as equitable estoppel to apply the FAA and so compel buyers complaining of breach of warranty to arbitrate their claims." *Id.* at 1533.

The plaintiffs argued that the defendant was not a signatory to the contract and did not have standing to enforce the arbitration clause. Continuing their argument, they maintained the company could not avail itself of any of the exemptions in law or equity allowing a non-signatory to invoke an arbitration clause. The court agreed. The court found that the defendant failed to meet its burden of proof on the third-party beneficiary argument or the agency theory. *Id.* at 1534–35. Further, the defendant failed to demonstrate it was entitled to invoke the arbitration clause under the theory of equitable estoppel. *Id.* at 1536–37.

Alternatively, the plaintiffs, relying on the Magnuson–Moss Act, maintained that, because the installment and sales contract between themselves and the dealer provided for final and binding arbitration, they could not be compelled to arbitrate their claims against the defendant. The court examined the language of the Act, the legislative history, and the regulations adopted pursuant to the Act and concluded that the Act does not allow for binding non-judicial dispute resolution such as that in the sales and finance contract. *Id.* at 1538. With the exception of a non-binding and informal dispute resolution process contained in the Act, consumers were to retain full and free access to the courts. *Id.* at 1537; *see also Southern Energy Homes, Inc. v. Lee,* No. 1970105 et al., 1999 WL 6988, —— So.2d —— (Ala. January 8, 1999).

Recently, arbitration has been held to conflict with the relief available under Title VII and, as a result, the arbitration clause was not unenforceable. In *Paladino v. Avnet Computer Techs., Inc.,* 134 F.3d 1054 (11th Cir.1998), the plaintiff sued her former employer for violations of Title VII, a Florida anti-discrimination law, and Florida's common law. The employer sought to stay the proceedings and enforce arbitration pursuant to a "consent to arbitration" agreement in the employee's handbook which the plaintiff has signed. Judges Cox and Tjoflat found that the FAA governed the motion to stay and that the arbitration clause was broad enough to include Title VII claims. *Id.* at 1060–62. The court however found that the arbitration clause did not allow the arbitrator to award the relief equivalent to court remedies. *Id.* at 1062. The arbitration clause contained a provision which barred the arbitrator from awarding damages except for breach of contract. Thus, the plaintiff could bring her Title VII claims to arbitration but could only receive an award of damages for breach of contract, a claim she was not asserting. The court determined this defeated the statute's remedial purpose and therefore the clause was unenforceable. *Id.*

Similarly, the Bankruptcy Code affords one forum for resolution of all disputes affecting the administration of the es-

---

13. Magnuson–Moss Warranty–Trade Commis- sion Improvement Act, 15 U.S.C. §§ 2301–2312.

845

tate. The policy is to centralize all disputes for the benefit of all parties. There is "related to" jurisdiction under 28 U.S.C. 1334(b) if the outcome of the litigation may conceivably have an effect on the estate being administered. *In re Lemco Gypsum,* 910 F.2d 784 (11th Cir.1990). Significantly, the parties stipulate jurisdiction.

The bankruptcy system is designed for swift adjudication of commercial disputes. It requires that parties have access to the courts, similar to the dispute resolution process in the Magnuson–Moss Act. The Code allows a detailed system of claims allowance, estimation of claims, recovery and administration of assets, confirmation and discharge. If parties to consumer contracts and contracts for delivery of services to the public can insist on arbitration and impose a stay on the proceedings in bankruptcy court, the whole bankruptcy system, with an estimated one and one-half million main cases filed per year plus the larger number of ancillary disputes, would grind to a halt. The Court finds there is an inherent conflict between the FAA and the Bankruptcy Code.

The conflict between the Bankruptcy Code and the Federal Arbitration Act is addressed by Mette Kurth:

In *Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 *reh'g denied,* 483 U.S. 1056, 108 S.Ct. 31, 97 L.Ed.2d 819 (1987) the Supreme Court held that the Arbitration Act's mandate of strict enforcement may be overridden by a conflicting federal statute or policy. The Bankruptcy Code is such a conflicting statute. Although the Bankruptcy Code does not require that every imaginable debtor-related proceeding be adjudicated in the bankruptcy court, its jurisdictional grant nevertheless is extremely broad. Where that jurisdiction conflicts with the Arbitration Act, *McMahon* recognizes that the Arbitration Act must give way. Such conflict exists both when the contractual parties pursue arbitration against the debtor and when the debtor in possession or trustee seeks to resolved a core matter. These matters should remain in the bankruptcy forum unless the bankruptcy judges, in their dis-

cretion, determine otherwise. When judges exercise this discretion, the key issue should be the most efficient resolution of the case, bearing in mind the benefits to and the effects on both the debtor and its creditors.

Mette H. Kurth, *An Unstoppable Mandate and an Immovable Policy: The Arbitration Act and the Bankruptcy Code Collide,* 43 UCLA L.Rev. 999, 1034 (1996). The Plaintiff maintains, and this Court agrees, that in this case the creditors' interests will be affected by granting the motion to compel arbitration. A debtor who has filed a bankruptcy petition generally cannot afford arbitration fees. The Plaintiff's plan was confirmed by this Court. Monies used to pay for arbitration will mean less money to fund the plan and pay creditors. The existence of these actual conflicts permit this Court to exercise its discretion and deny arbitration.

The Plaintiff further contends that the FAA does not apply to movant MeritPlan Insurance Company. He maintains that the McCarran–Ferguson Act 15 U.S.C. § 1011 et seq. precludes application of federal laws if, as a result, laws of a state regulating insurance would be invalidated, impaired, or superseded. *See, e.g. Miller v. National Fidelity Life Ins. Co.,* 588 F.2d 185, 186–187 (5th Cir.1979). In particular, he relies on 15 U.S.C. § 1012 which provides:

(a) State regulation

The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

(b) Federal regulation

No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance....

In this instance, the FAA impairs the Alabama Mini–Code which regulates the sale of insurance to consumers. *See* ALABAMA CODE § 5–19–20 (1975).

## IX. WHETHER THIS ARBITRATION CLAUSE LIMITS ARBITRATION TO DISPUTES BETWEEN THE DEALER AND PURCHASER.

Although this Court has already found that there was no enforceable agreement to arbitrate, it will consider whether, if there was an enforceable arbitration provision, the parties intended to limit the arbitration clause to any disputes that arose between themselves. If so, then movants cannot enforce the arbitration clause. Courts must keep in mind that arbitration clauses are a matter of contract law. Thus, a party cannot be compelled to arbitrate any dispute which he or she has not agreed to submit to arbitration. *AT & T Technologies, Inc., v. Communications Workers of America,* 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986).

The Plaintiff argues that the parties never entered into an arbitration agreement but to the extent an agreement is enforceable, the parties never intended to arbitrate any disputes other than those arising between the dealer and purchaser. In support of this argument, the Plaintiff relies on two cases. The first, *Ex parte Jones,*[14] serves as a limitation on the equitable estoppel cases. In *Jones,* the purchasers entered into a loan agreement with the defendant, Money Tree. As part of the agreement, the loan officer obtained a single-premium collateral insurance policy from First Colonial. This policy was a separate contract from the loan agreement. The premium was financed as part of the loan. The loan contract between Money Tree and the purchasers contained an arbitration agreement which specifically stated that all disputes between *the debtor and creditor* would be submitted to arbitration. The purchasers sued Money Tree, the loan officer, and First Colonial for fraud and bad faith failure to pay a claim. Money Tree moved to compel arbitration with the purchasers pursuant to the arbitration clause in the agreement. First Colonial joined in the motion. The purchasers argued that their claims against First Colonial were not subject to arbitration under the loan agreement.

The court found that the contract with First Colonial did not meet the first require-

ment of the FAA—the existence of a written arbitration clause. In considering whether the loan agreement between Money Tree and the purchasers required the purchasers to arbitrate, the court found that the agreement was limited to the creditor and debtor and that First Colonial did not have standing to seek enforcement of the clause. *Id.* at 1167. In arriving at this conclusion, the court concentrated on the intent of the parties. Also, the court found it important that the purchasers never saw the First Colonial contract until after their car was destroyed. The dissent in this case notes the exceptions and maintains that the facts fit into the equitable estoppel exception. *Id.* at 1169–70 (Maddox, J. dissenting).

The Plaintiff's reliance on *Ex parte Jones* is correct. The Court must consider the corresponding contract terms. The agreement in the instant case states:

D. The undersigned acknowledges and agrees as follows: .... (2) that in the event any dispute(s), under the terms of this contract of sale arise, (including but not limited to, the terms of the agreement, the condition of the motor vehicle sold, the conformity of the motor vehicle sold to the contract, the representations, promises, undertakings or covenants made by dealer in with the sale of the motor vehicle, or otherwise dealing with the motor vehicle, any terms of financing in connection therewith, or any terms of any credit life and/or disability insurance purchased simultaneously herewith or extended service or maintenance agreements(s)) that dealer and the purchaser agree to submit such dispute(s) to binding arbitration . . .

(Buyer's Order ¶ D). In *Jones,* the arbitration agreement stated: "All disputes, controversies or claims of any kind and nature *between* creditor and debtor arising out of or in connection with the within agreement...."

(emphasis added) The issue then is whether the parties in this instance intended to limit their arbitration agreement to issues between themselves.

14. 686 So.2d 1166 (Ala.1996).

The wording in this arbitration agreement is not as clear as the wording in *Jones*. Unlike the arbitration agreement in *Jones*, this arbitration clause does not *expressly* limit itself to disagreements between the debtor and the creditor. The court in *Jones* correctly focused on the parties' intention and the clear language of the agreement to find that arbitration agreement limited itself to only those disputes between the debtor and creditor.[15]

The Supreme Court has stated that: "[T]he FAA's pro-arbitration policy does not operate without regard to the wishes of the contracting parties."[16] The arbitration clause may be read to say that the debtor and creditor mutually agree to submit any dispute that arises under the contract to arbitration. This interpretation does not limit it to disputes between the parties. However, it could also be read that the phrase "that the dealer and the purchaser agree to submit such dispute(s) to arbitration" limits it to only those between the two signatories. The key word is "and." If the parties substituted "or" for "and" it would be clear that they contemplated other parties bringing suit. This interpretation indicates that the arbitration clause is ambiguous as to whether the parties intended to limit arbitration to disputes between themselves.

■■■ The Alabama Supreme Court recently enunciated the test for determining whether a contract clause is ambiguous: when an agreement is reasonably susceptible to more than one meaning, an ambiguity exists. *Voyager Life Ins. Co. v. Whitson*, 703 So.2d 944, 948 (Ala.1997). Whether a contract is ambiguous is a matter of law to be decided by the court. *Coastal Ford, Inc. v. Kidder*, 694 So.2d 1285, 1288 (Ala.1997) (*citing Austin v. Cox*, 523 So.2d 376 (Ala.1988)). When a trial court finds the meaning of a contract ambiguous, it may examine evidence

other than the contract itself. *ISS Int'l Serv. Sys., Inc. v. Alabama Motor Express, Inc.*, 686 So.2d 1184, 1187 (Ala.Civ.App.1996). If the intent of the parties is in dispute, a question of fact arises for the factfinder. *Id.* "Whether an arbitration clause applies to a claim is a matter of state-law contract interpretation, which 'is guided by the intent of the parties....'" *Kidder*, 694 So.2d at 1288 (Ala.1997) (*quoting in part Allied–Bruce Terminix v. Dobson*, 684 So.2d 102, 110 (Ala. 1995)). Any construction given to the language must be reasonable.[17]

There is little evidence in the record regarding the parties' intentions. Pokey Brimer is no longer a party in this action. The Plaintiff's brief establishes his position: the non-signatories are not covered by the arbitration agreement. (Pl.'s B.R. in Opp'n to Def.'s Mot. to Compel Arbitration at 3). Specifically, he maintains that the language limits the agreement to arbitrate to disputes between himself and the seller. (*Id.* at 4–5).

■■■ It is a general rule of contract construction that "and" can be read as "or" and vice-versa under certain conditions. *State Mut. Life Assurance Co. of Worcester, Mass. v. Heine*, 49 F.Supp. 786, 788. The words should not be treated as interchangeable "when their accurate and literal reading does not render the sense dubious." *Id.* Again, the intent of the parties must determine whether the Court chooses to adopt this construction. As stated above, the only statement of intent before the Court is that the parties did not intend to the arbitration clause to extend to others. Thus, this Court declines to read "and" as "or."

■■■ Generally, courts construe ambiguous language in a contract most strongly against the party who selected the language. *Lackey v. Central Bank of the South*, 710

---

**15.** The Eleventh Circuit stated that each party must rely on the written terms of its agreement in asserting its claims. *Sunkist*, 10 F.3d at 757. In this instance the parties chose to limit their agreement to themselves.

**16.** *Mastrobuono v. Shearson Lehman Hutton, Inc.* 514 U.S. 52, 57, 115 S.Ct. 1212, 131 L.Ed.2d 76, 84 (1995).

**17.** The reasonableness standard pervades contract interpretation. For example, if there is a reasonable interpretation of the contract's language, then there is no ambiguity. Likewise, if there are two reasonable interpretations of the contract's language then ambiguity exists. *Boone v. Safeway Ins. Co. of Alabama*, 690 So.2d 404, 406 (*quoting Vainrib v. Downey*, 565 So.2d 647, 648 (Ala.Civ.App.1990)).

So.2d 419, 422 (Ala.1998). The rule, *Contra Proferentem,* is generally a rule of last resort that should be applied only when the other rules of construction have been exhausted. *Id.* "As a corollary of this rule, a contract drawn by one party must be construed, if its meaning is doubtful, in favor of the non-drafting party." 17A AM.JUR.2D *Contracts* § 348 (1991). This rule adds weight to the interpretation given by the Plaintiff.

■ There is a further principle of contract construction that supports a narrow reading of the arbitration clause. When a contract, or a part thereof, limits a party's legal rights, it should be strictly construed. 17A AM.JUR.2D *Contracts* § 345 (1991); *Harvey Constr. Co. v. Parmele,* 253 Iowa 731, 113 N.W.2d 760 (Iowa 1962). In this instance, the Plaintiff is denied access to the courts and a right to a jury trial, both fundamental constitutional rights. Thus, this clause should be strictly construed to limit its enforceability to disputes between the signatories.

■ This Court concludes that the language of the arbitration clause is ambiguous as to whether the arbitration clause is limited to disputes between the dealer and purchaser. The burden of proof is on the movants to prove that the issues are arbitrable, i.e. that the arbitration clause is not limited to disputes between the purchaser and dealer. They have failed to provide any evidence that the parties intended to allow non-signatories to arbitrate claims. As the only statement of intent before the Court is the Plaintiff's brief which asserts it was not his intention to arbitrate non-signatory claims, the movants must fail in their contention. Other rules of contract construction support this conclusion.

## X. WHETHER THE NON-SIGNATORIES MAY COMPEL ARBITRATION OF THEIR DISPUTES.

In addition, the Plaintiff argues that he never entered into an arbitration agreement, but to the extent an agreement is enforceable, the parties never intended to arbitrate

any disputes other than those arising between the seller and himself. The movants did not sign the agreement, thus, the Plaintiff maintains he never consented to arbitrate any issues with them. In response, Merit-Plan argues that, under Eleventh Circuit law, it can invoke the arbitration clause due to an agency relationship, a third-party beneficiary relationship, and the doctrine of equitable estoppel. Wynn, on the other hand, only relies on the equitable estoppel theory.

■ A non-party seeking to compel arbitration must establish grounds, in law or equity, why it should be permitted to assert rights under a contract to which it is not a party. *Boyd v. Homes of Legend, Inc.,* 981 F.Supp. 1423, 1431–32 (M.D.Ala.1997). The general rule is that one who is not a party to a contract has no standing to compel arbitration. *Britton v. Co-op Banking Group,* 4 F.3d 742, 744 (9th Cir.1993). The Alabama Supreme Court has stated that parties are not bound by an arbitration clause simply because it exists. *Ex parte Isbell,* 708 So.2d 571, 579 (Ala.1997). Exceptions, however, are allowed to the general rule: "[A] signatory [is] bound to arbitrate with a non-signatory at the non-signatory's insistence because of the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the non-signatory's obligations and duties in the contract. . . ." *Thomson–CSF, S.A. v. American Arbitration Ass'n,* 64 F.3d 773, 779 (2d Cir.1995). The Court's inquiry must "be peculiarly fact-specific and will require a penetrating analysis of the facts and an application of traditional contract principles." *Isbell,* 708 So.2d at 579. "A party who relies upon a contract provision to which it was not a signatory must show that the factual situation falls within a class of cases such as *Sunkist* or *McBro.*" *Id.*

■ The Eleventh Circuit has held that a non-signatory's motion to compel arbitration is due to be granted when its claims are "intimately founded in and intertwined with the underlying contract obligations." *McBro Planning and Dev. Co. v. Triangle Elec. Constr. Co.,* 741 F.2d 342, 344 (11th Cir. 1984).[18] As the court explained in *Boyd v.*

---

**18.** The Supreme Court of Alabama adopted this rationale in *Ex parte Dyess,* 709 So.2d 447, 451 (Ala.1997).

*Homes of Legend, Inc.,* 981 F.Supp. 1423, the doctrine of equitable estoppel applies if one of two fact patterns are present. The first requires "the duties and responsibilities alleged to have been breached by the non-signatory must have arisen under and have been assigned to the non-signatory by the contract containing the arbitration provision." *Id.* at 1432–33. The second factual setting arises when the signatory raises allegations of substantially interdependent and concerted misconduct by both the signatory and one or more of the non-signatories. *Id.* at 1433

Judge Thompson has written extensively on the second exception. In *Wilson v. Waverlee Homes, Inc.,* 954 F.Supp. 1530 (M.D.Ala.1997), he stated:

> It is not enough that the defendant and the third party have common and parallel duties toward the plaintiff, and so could both be sued on the same theory of tort. . . . What matters is that none of the duties the plaintiffs are claiming that Waverlee breached arose under and were assigned to it by the sales agreements between the plaintiffs and Hart's Mobile Home, which are the sole agreements governed by the arbitration clause here. The warranty claims here are not intertwined with and founded upon the sales installment agreements, except in the utterly collateral sense that if the plaintiffs had never purchased their mobile homes, they would not have been protected by the warranties that came with them.

*Id.* at 1536. Thus, this Court must examine each of the defendants claims to determine whether they are intertwined and founded upon the sales installment contract.

Count One is against CAC and is a request for the Court to determine the extent the Plaintiff's claim is secured. This Count does not arise out of the sales installment contract and therefore the Plaintiff cannot be equitably estopped from denying arbitration. Count Two is an allegation of fraud against CAC, Wynn, and MeritPlan for fraud, deceit, etc. in the sale of insurance and certain charges. Count Three is limited to CAC and alleges violations of the Alabama Mini–Code. These allegations are based on fraud in the sales contract. Count Four alleges conspiracy and fraud in the sale of insurance, the service contract, and certain fees against all the Defendants. Count Five is the class action allegations and Count Six is for declaratory judgment. This Court concludes that the Plaintiff is not equitably estopped from denying the arbitration clause.

The Court is mindful that it's examination must be very fact specific and carefully analyze the claims as well as the contract to determine whether the claims asserted are intertwined. It is further aware that courts are "loath to find that the claims against a non-signatory are intimately founded in and intertwined with the underlying contractual obligations" unless one of the two factual scenarios is present. *Boyd,* 981 F.Supp. at 1432.

Initially, it is clear that a close, indeed a very close relationship exists between the entities involved. This, however, is not enough. Equitable estoppel prevents one party from attempting to gain from the non-signatory the benefit of the contract while disclaiming application of the arbitration provision. This is not the case here. The Plaintiff is not attempting to gain any benefit under the contract from the Defendants while disclaiming the arbitration provision.

Under the first scenario, the duties and responsibilities alleged to have been breached by the non-signatory must have arisen under and have been assigned to the non-signatory by the contract containing the arbitration provision. *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.,* 10 F.3d 753, 757–58 (11th Cir.1993) *cert. denied,* 513 U.S. 869, 115 S.Ct. 190, 130 L.Ed.2d 123 (1994). It is readily apparent to this Court that it will not need to interpret the contract to fully adjudicate the fraud claims. Significantly, the seller, Pokey Brimer, is no longer a party defendant in this proceeding. The claims that exist are only against non-signatory defendants. As such, it is difficult to find that the claims are integrally connected with and founded on the sales installment and financ-

ing contract.[19] In addition, the Plaintiff's claims are not based on a breach of any duty of contractual obligations. The claims asserted are statutory violations and common law theories of injury. Clearly, they are related to the contractual obligations but not intertwined with them. Finally, as stated above, this Court finds that the arbitration clause is limited to disputes between the seller and the purchaser and is not broad enough to encompass these claims.

In regards to the second scenario, the Defendants' claims must also fail. This exception requires the Plaintiff allege concerted action between the signatory and non-signatories. *Boyd,* 981 F.Supp. at 1433-34. This Court reiterates its prior holding that there is no agreement to arbitrate. Thus, the Defendants lack a signatory. Even if Brimer had signed the arbitration clause, the Defendants' argument must fail. Brimer has been dismissed as a Defendant in this action. Thus, there are no longer any allegations of concerted action by the signatory and non-signatories.

This Court finds support for its conclusions in a recent unpublished opinion, *MS Dealer Serv. Corp. v. Franklin,* No. 98-AR-1321-E (N.D.Ala. Aug. 17, 1998). In that case, Franklin purchased a vehicle from Jim Burke Motors, Inc. As part of the sale, she purchased a service contract from MS Dealer. Later, she filed a lawsuit against Burke and MS Dealer alleging that both parties violated the Alabama Mini-Code § 5-19-19 and committed fraud and civil conspiracy. The Buyer's Order contained an arbitration clause:

> Buyer hereby acknowledges and agrees that all disputes and controversies of every kind and nature between *buyer and Jim Burke Motors, Inc.* arising out of or in connection with the purchase of this vehicle will be resolved by arbitration....
>
> All disputes and controversies of every kind and nature *between the parties* hereto arising out of or in connection with this contract ... shall be submitted to binding

arbitration pursuant to the provision of the Federal Arbitration Act.... (emphasis in original)

*Id.* at 3. There was no arbitration agreement in the service contract between Franklin and MS Dealer.

The Defendant alleged that the arbitration agreement was broad enough to encompass its dispute with Franklin. Judge Acker, however, rejected that argument. He noted that the agreement to arbitrate limited itself to disputes between the buyer and the dealer. *Id.* at 5. The Defendants also maintained that the Plaintiff was equitably estopped under the *McBro* holding from denying arbitration. Judge Acker rejected this argument also. Franklin's claims against MS Dealer were not grounded on any alleged breach of the sales agreement between Burke and Franklin, "[A]lthough related to the sales contract, they are not 'intertwined' with the contractual obligations imposed by the sales contract." *Id.* at 7.

This Court also rejects Defendant Merit-Plan's agency and third-party beneficiary theories. As previously stated, this Court finds that an agreement to arbitrate does not exist in this case. Further, if one did exist, the language of the agreement establishes that the parties intended to limit its application to disputes between the dealer and the Plaintiff.

## XI. CONCLUSION

This Court finds that the Defendants failed to meet their burden of proof that an enforceable agreement to arbitrate exists in this case. Thus, the Defendants' Motions to Compel Arbitration are denied.

---

19. In *Med Center Cars, Inc. v. Smith,* No. 1960214 et al., 1998 WL 560255, —— So.2d —— (Ala. Sept.4, 1998), the court noted "[I]f only nonsignatories were found to have conspired, then the claims against them would not have an integral connection with the claims against the signatory defendants so as to subject all claims to arbitration." *Id.* at *8, ——. Likewise, in this proceeding, only the non-signatories could be found to have conspired.