John PATTERSON, Felicia Berry and Jerry Robinson, Plaintiffs,

v.

RED LOBSTER aka GMRI, Inc., Defendant.

No. 3:99CV155LN.

United States District Court,
S.D. Mississippi,
Jackson Division.

Oct. 6, 1999.

---

Lynda Carol Robinson, Robinson Law Firm, P.A., Jackson, MS, Ermea J. Russell, Equal Employment Opportunity Commission, Jackson, MS, William F. Jordan, Jordan, Daniels & Goree, PLLC, Jackson, MS, for plaintiffs.

Herbert C. Ehrhardt, Butler, Snow, O'Mara, Stevens & Cannada, Jackson, MS, Robert M. Williams, Jr., Devon L. Gosnell, Ford & Harrison, LLP, Memphis, TN, for defendant.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, Chief Judge.

This cause is before the court on motion of defendant Red Lobster, aka GMRI, Inc., to dismiss or, alternatively, to stay the action and compel arbitration of Patterson's and Robinson's Title VII, § 1981 and state law causes of action. Plaintiffs Patterson and Robinson have responded in opposition.[1] The court, having considered the memoranda and submissions of the parties, concludes that defendant's motion is not well taken and should be denied.

John Patterson, a black male, has been employed by Red Lobster for almost thirty years. He has held various positions within the restaurant, but began working as a bartender around 1991. Jerry Robinson, also a black male, was employed by Red Lobster from around 1995 to 1997 and likewise held several positions, including that of bartender.

---

1. Felicia Berry is also a plaintiff in this action, but, because she terminated her employment prior to the effective date of defendant's dispute resolution procedure, the defendant does not contend that her claims are subject to mandatory arbitration. Thus, this motion pertains only to the claims of Patterson and Robinson and it is only those two to which the term "plaintiffs" refers for purposes of this motion.

The plaintiffs claim that they were first alerted to potential racial discrimination sometime around May of 1997 when they were informed by Felicia Berry that Al Seagers, a white male who had only recently begun training as a bartender, was hired by Red Lobster at a rate of $10.00 per hour,[2] while they were being paid "substantially less," despite their greater experience as bartenders.[3] After the pay discrepancy was brought to the manager's attention, Patterson received a $.40 pay increase, but was still earning less than the $10.00 an hour that Seagers was being paid. Robinson, who had been transferred to server after having been told that business could not justify allotting him more hours at the bar, was transferred back to the bar at a rate of $10.00 an hour, but only after he questioned the pay and full-time hire of Seagers.

Shortly thereafter, around June of 1997, plaintiffs filed a complaint with the EEOC, alleging unlawful employment practices. After the filing of their complaint, the plaintiffs were "subjected to a barrage of harassment by the manager of Red Lobster," including being publicly denounced as incompetent, working reduced hours while the hours of white employees increased or remained the same, working overtime without additional compensation while other employees were paid for overtime, and receiving disciplinary actions and threats of termination for actions that went undisciplined when performed by other employees. Additionally, Seagers was "put 'in charge'" of the bar, Patterson was removed from bartending, and the manager repeatedly suggested that the plaintiffs should leave Red Lobster. As a result, both Patterson and Robinson filed retaliation charges with the EEOC against Red Lobster.

During the same month that the plaintiffs filed their initial complaint with the EEOC, June 1997, Red Lobster adopted a Dispute Resolution Procedure (DRP) to become effective for all employees on October 27, 1997. Under the company's DRP, once it becomes obvious that a dispute cannot be resolved through the company's "Open Door Policy," an employee is to present his or her complaint to a peer review panel made up of two co-workers and one manager. After the panel has received the complaint, both the manager who made the adverse decision and the employee are allowed to present their cases to the panel, which will investigate the complaint and arrive at a final decision. If either the employee or the company is dissatisfied with the panel's conclusion, the matter may be submitted to mediation, or it may proceed directly to binding arbitration.

The DRP was presented by Red Lobster as the exclusive means by which employees could resolve disputes with the company. In order to familiarize the employees with the company's new procedure, Red Lobster conducted a training session, called "the Dispute Resolution Procedure Employee Roll–Out Meeting," on August 16, 1997. The training lasted approximately thirty minutes and consisted of an oral presentation and video explaining the DRP. Employees were also given handouts explaining the procedure.

**2.** According to plaintiffs' complaint, Felicia Berry confronted Morris Casey, the plaintiffs' manager, with information she had received regarding Seagers' higher rate of pay. Casey purportedly first denied that Seagers was being paid some $2.00 per hour more than Berry, but then became angry and tried to ascertain Berry's sources of information. Casey finally told Berry, essentially, that if she did not like his decision to pay Seagers a higher wage, she could always terminate her employment with Red Lobster. Upon becoming "so upset and distraught in the face of the blatant act of discrimination," Berry heeded her manager's advice and quit her job at the restaurant.

**3.** There is no evidence of the precise pay received by Patterson and Robinson at the time that Seagers was hired—only that it was "substantially less" than Seagers' rate of $10.00 per hour.

At the meeting, the employees were asked to sign a sign-in sheet to indicate that they had attended the training. Although both Patterson and Robinson attended the training session, they refused to sign in. In fact, according to the defendant, the plaintiffs refused to sign any documents during this time relating to their employment with Red Lobster.

After having exhausted their administrative remedies with the EEOC, but without first invoking the company's DRP, the plaintiffs filed this action on February 26, 1999, charging Red Lobster with racial discrimination and retaliation against them for opposing the restaurant's unlawful employment practices. They allege violations of Title VII and § 1981, as well as state law causes of action for breach of contract and intentional or negligent infliction of emotional distress. They seek declaratory injunctive and equitable relief, along with compensatory and punitive damages, costs and attorneys fees.

Defendant moves to dismiss plaintiffs' action, contending that because plaintiffs' claims are subject to mandatory, final and binding arbitration, which was not invoked within the one-year period provided in defendant's DRP, they have failed to state a claim upon which relief can be granted. Alternatively, defendant urges that plaintiffs' claims are subject to the DRP, which requires employees to submit any and all claims against Red Lobster to arbitration, and that the court should therefore compel

arbitration and issue a stay of the case pending arbitration of the claims of Patterson and Robinson.

The Federal Arbitration Act (FAA), 9 U.S.C. §§ 1–14, was passed in an effort to "ameliorate perceived judicial hostility to arbitration" and has "clearly established a federal policy in favor of arbitration." *Bhatia v. Johnston,* 818 F.2d 418, 421 (5th Cir.1987). The Act was intended to enforce private agreements between parties[4] and provides that "[a] written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."[5] 9 U.S.C. § 2.

Section 3 of the Act permits the court to stay proceedings pending arbitration if the court is "satisfied that the issue involved ... is referable to arbitration" under an arbitration agreement. Under § 4 if a party to an agreement refuses to arbitrate, the opposing party may bring an action to compel arbitration, and after hearing the parties the court "being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue," shall direct the parties to arbitrate. Further, § 4 declares that "[i]f the making of the arbitration agreement or the failure ... to perform the same be in issue, the

---

**4.** *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985).

**5.** The Fifth Circuit has held that the FAA encompasses claims brought under Title VII. *See Rojas v. TK Communications, Inc.,* 87 F.3d 745, 748–49 (5th Cir.1996); *see also Alford v. Dean Witter Reynolds, Inc.,* 939 F.2d 229, 230 (5th Cir.1991) (concluding that Title VII claims, like age discrimination claims, are subject to mandatory arbitration). Moreover, while Section 1 of the FAA contains an exclusionary clause that applies to employees "actually engaged in the movement of goods in interstate commerce in the same way that seamen and railroad workers are," the Fifth

Circuit has held that this exclusionary clause is to be narrowly construed. *See Rojas,* 87 F.3d at 748–49 (holding that disc jockey's claims for sexual harassment and retaliation under Title VII were not exempt from the arbitration agreement applicable to "any other disputes" because the plaintiff was not " 'actually engaged in the movement of goods in interstate commerce in the same way that seamen and railroad workers are.' ") (quoting *Asplundh Tree Expert Co. v. Bates,* 71 F.3d 592, 601 (6th Cir.1995)). In any event, plaintiffs do not dispute that their employment places them within the ambit of the FAA or that their claims are of the type falling within the purview of defendant's DRP.

court shall proceed summarily to the trial thereof."

*Bhatia,* 818 F.2d at 421 (quoting 9 U.S.C. §§ 3–4).

In *Webb v. Investacorp, Inc.,* 89 F.3d 252, 257–58 (5th Cir.1996), the Fifth Circuit outlined the framework for adjudicating a motion to compel arbitration under the Federal Arbitration Act. The process involves a two-step inquiry:

The first step is to determine whether the parties agreed to arbitrate the dispute in question. This determination involves two considerations: (1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement. When deciding whether the parties agreed to arbitrate the dispute in question, "courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995). In applying state law, however, "due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself must be resolved in favor of arbitration." *Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Jr. Univ.,* 489 U.S. 468, 475–76, 109 S.Ct. 1248, 1253–54, 103 L.Ed.2d 488 (1989). The second step is to determine "whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims." *Mitsubishi Motors [Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614,

626, 105 S.Ct. 3346, 3353–54, 87 L.Ed.2d 444 (1985)].

*Id.* (additional citations omitted).[6] *See also Alamria v. Telcor Int'l, Inc.,* 920 F.Supp. 658, 662 (D.Md.1996) (court must first decide "(1) whether a party agreed to submit to arbitration, and (2) which disputes the parties agreed to submit to arbitration").

In the case at bar, the focus of plaintiffs' objection to defendant's motion is on step one of this process, in that they maintain that there is no agreement between them and defendant to arbitrate any dispute, nor to arbitrate this particular dispute. More to the point, they argue that there has never been a valid *agreement* between the parties to arbitrate but rather the unilateral implementation by defendant of an arbitration policy to which plaintiffs never manifested their assent. They urge further that even if it could somehow be concluded that the company's unilateral adoption of an arbitration policy to which they never agreed constituted an arbitration agreement which would apply to disputes which might have arisen following its implementation, in no event could it reasonably be construed to apply to disputes which pre-existed the putative arbitration "agreement."

▮▮▮ In light of the "liberal federal policy favoring arbitration agreements" embodied in the FAA, *Moses H. Cone Mem. Hosp. v. Mercury Constr. Co.,* 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983), the determination whether the parties agreed to arbitrate the dispute in question is "to be addressed with a 'healthy regard for the federal policy fa-

**6.** The court noted further that "[i]n some cases, an additional, threshold inquiry will be whether the parties agreed to arbitrate the issue of arbitrability itself or whether the parties intended for arbitrability to be decided by a court, as in a motion to compel arbitration." *Webb,* 89 F.3d 252, 257–58 (citing *First Options,* 514 U.S. at 944, 115 S.Ct. at 1923–26 (1995)). The court explained that "[w]hile contracting parties may agree to submit the question of arbitrability to an arbitra-

tor, '[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so.' " *Id.* (quoting *First Options,* 514 U.S. at 944, 115 S.Ct. at 1924). Here, there is no contention by any party, nor "clear and unmistakable" evidence adduced, that the issue of arbitrability has been reserved for decision by an arbitrator, and thus the issue is properly before this court.

voring arbitration,' with doubts regarding the scope of the agreement resolved in favor of arbitration." *Bhatia*, 818 F.2d at 421 (quoting *Moses H. Cone*, 460 U.S. at 24–25, 103 S.Ct. at 941)); *Moses H. Cone*, 460 U.S. at 24–25, 103 S.Ct. at 941 ("doubts concerning the scope of arbitral issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability"). At the same time, however, it must be remembered that " 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit'." *AT & T Technologies, Inc. v. Communications Workers of Am.*, 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986) (quoting *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960)); *see also First Options*, 514 U.S. at 943, 115 S.Ct. at 1924 ("arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration"); *Smith Barney Shearson, Inc. v. Boone*, 47 F.3d 750, 752 (5th Cir.1995) ("a party may only be compelled to arbitrate an issue he has previously agreed to arbitrate"). "This axiom recognizes the fact that arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration." *AT & T Techs.*, 475 U.S. at 648–49, 106 S.Ct. at 1418. Thus, while issues as to the scope of an agreed-upon arbitration clause are subject to a presumption of arbitrability, this presumption does not apply to the preliminary question of whether there is a valid agreement to arbitrate between the parties. *See In re Knepp*, 229 B.R. 821, 835 (Bankr.N.D.Ala.1999) (emphasizing that presumption favoring arbitration is not applied to preliminary question of whether the parties agreed to arbitrate); *Consolidated Rail Corp. v. Metropolitan Transp. Auth.*, No. 95 Civ.

2142(LAP), 1996 WL 137587, at *7 (S.D.N.Y. March 22, 1996) (recognizing that federal presumption of arbitrability does not apply to issue of contract formation); *AT & T Technologies*, 475 U.S. at 650, 106 S.Ct. at 1419 (recognizing presumption of arbitrability "where a contract contains an arbitration clause"); *United Steelworkers of America, AFL—CIO v. ASARCO, Inc.*, 970 F.2d 1448, 1454 (Weiner, J., concurring/dissenting) ("The arbitrability presumption is never properly used to force to arbitration an issue that the parties have not clearly agreed to arbitrate."). Instead, as to this issue, the defendant bears the burden "to show that there is 'clear and unmistakable evidence' that there was an agreement to arbitrate between the parties." *In re Knepp*, 229 B.R. at 821. Having considered the evidence of record, the court concludes that defendant has failed to sustain its burden in this regard.

■■■ Under general common law contract principles, the mutual assent of each of the contracting parties to the terms of the contract is essential to the formation of a valid contract. *Lanier v. State*, 635 So.2d 813, 826 (Miss.1994), and the court "will not draft a contract between two parties where they have not manifested a mutual assent to be bound," *A. Copeland Enters. v. Pickett & Meador, Inc.*, 422 So.2d 752 (Miss.1982). Mississippi law recognizes that "acceptance of a contract as binding upon a party may be shown by his actions, and by any definite and unequivocal course of conduct disclosing that the party has acceded or assented to it," and acceptance so manifested "is as binding on him as had he endorsed his assent in formal writing." *McInnis v. Southeastern Automatic Sprinkler Co.*, 233 So.2d 219 (Miss.1970) (quoting 17 C.J.S. Contracts § 58 (1963)). In this case, though, there is no proof of any manifestation on the part of plaintiffs of assent to be bound by defendant's arbitration policy. The proof, in fact, demonstrates a lack of assent.

At the time defendant implemented its DRP policy, plaintiffs were already embroiled in controversy with defendant relative to the very subject matter of this lawsuit and had already instituted their administrative proceeding with the EEOC. Particularly in view of this circumstance, it is reasonable to assume that had they intended that their pre-existing dispute would be made subject to defendant's arbitration policy, they would have given some indication to that effect. They did not. On the contrary, while they attended the defendant's DRP training session, plaintiffs specifically refused to sign-in at the session and by that simple act, manifested their rejection of the policy.[7] The court therefore concludes that defendant's motion to compel arbitration should be denied. *See General Motors Corp. v. Pamela Equities Corp.*, 146 F.3d 242, 247 (5th

Cir.1998) (Unless required by statute, a person who is not a party to a pre-dispute contract to arbitrate cannot be compelled to submit a dispute to arbitration.... A party to a contract to arbitrate prospective disputes, however, may be compelled by a court to submit a post-contract dispute to arbitration if the arbitration contract requires him to do so.); *see also Boyd v. Homes of Legend, Inc.*, 981 F.Supp. 1423, 1429 (M.D.Ala.1997) ("It is almost axiomatic, as a first rule of state common law governing the formulation of contracts, that parties must manifest assent to a bargain in order to be bound under it," and hence "state law generally parallels the Supreme Court's observation in *AT & T Technologies*" that parties cannot be compelled to arbitrate disputes which they have not agreed to arbitrate).[8] To hold

---

**7.** The defendant avers that plaintiffs' continued employment is tantamount to an acceptance of the company's DRP and cites cases in support thereof. However, the court finds that each of the cases cited by the defendant is distinguishable from the case at bar and, therefore, finds the defendant's argument unpersuasive, particularly considering that the defendant's policies were implemented well after its awareness of plaintiffs' claims and the plaintiffs clearly indicated that they did not intend to be bound by such a procedure.

**8.** The imposition of defendant's mandatory arbitration policy is troublesome for an additional reason as well. Regarding arbitration fees and costs, the defendant's policy provides that

> [t]he arbitrator's fees and expenses, the costs of the hearing facilities, plus any costs owed to the AAA or the arbitrator shall be shared equally by both the Employee and the Company, except that the Employee shall not be required to pay more than the equivalent of two weeks' salary in his/her current position, or the last position held with the Company. Any amount over this limit shall be paid by the Company.

Both the D.C. Circuit and the Tenth Circuit have held that a mandatory arbitration agreement, entered into as a condition of continued employment and requiring the employee to pay a portion of the arbitrator's fees, is unenforceable under the FAA. *See Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1482 (D.C.Cir.1997) (concluding that arbitration agreement requiring employee to pay all or

part of arbitrator's fees and expenses and imposed as a condition of employment is unenforceable, as "it would undermine Congress's intent to prevent employees who are seeking to vindicate statutory rights from gaining access to a judicial forum and then require them to pay for the services of an arbitrator when they would never be required to pay for a judge in court"); *Shankle v. B–G Maintenance Management of Colorado, Inc.*, 163 F.3d 1230, 1233–34 (10th Cir.1999) (rendering agreement requiring employee to share arbitration expenses unenforceable because it "placed [the employee] between a rock and a hard place" in that "it prohibited use of the judicial forum, where a litigant is not required to pay for a judge's services, and the prohibitive cost substantially limited use of the arbitral forum"). *But see Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 170 F.3d 1, 16 (1st Cir.1999) (concluding that possibility of plaintiff being required to share arbitration fees is not, alone, sufficient to invalidate arbitration agreement from the outset both because of the possibility that the arbitrator may not require the plaintiff to pay fees and, if he or she does, plaintiff may seek judicial review of excessive fees after the arbitration is concluded and because arbitration is often more affordable to plaintiffs and defendants than is the judicial process); *Koveleskie v. SBC Capital Mkts., Inc.*, 167 F.3d 361, 366 (7th Cir.1999) (mandating arbitration of brokerage firm employee's claims, relying on the propositions that a plaintiff may seek judicial review of unreasonable arbitration fees and that arbitration is often more affordable

otherwise would sanction the adoption of mandatory arbitration policies retroactively and unilaterally preclude employees from asserting their rights in the forum of their choosing.

In conclusion, because the court finds that the plaintiffs did not assent to defendant's mandatory arbitration procedure, defendant's motion to dismiss is denied, as is its motion to compel arbitration.

than litigating a claim in court). While the court finds it unnecessary to conclude, at this time, whether such a provision renders an arbitration agreement unenforceable *per se*, it does consider it to be a factor weighing against enforcement of the agreement at issue.